## CHARLES H. ENNIS v. MAGGIE ENNIS, Appellant.

"Cruel and Inhuman Treatment:" DIVORCE. Defendant broke several engagements to others before her marriage to plaintiff. She entertained a bitter feeling toward E., a friend of his. He told her she loved E. or she would not allow his conduct to worry her. She answered that she loved plaintiff more. He finally induced her to invite E. to the wedding. She called on E. for this purpose, and he told her she ought to have married him. She told plaintiff that her feelings toward E. had changed and suggested a postponement of the marriage, but he induced her to go on with it. She first wrote E. that he had her heart and plaintiff her hand. She left plaintiff shortly after the marriage, and E. urged her to return. She finally did so. Plaintiff describes their life as "rocky," and says that there was no home, that they lived chiefly on canned goods, that whenever she met E. she became unhappy and wild, and would cry constantly. A newspaper article was published, entitled "Is Marriage a Failure. Ask C. H. Ennis." People talked about it and friends spoke to him concerning it. E. was a topic of frequent talk and constant irritation between them, but it does not appear that he was directly responsible for it. Plaintiff claims that his health suffered serious impairment and that he became unable to do business. The court finds that she acted without malice or ill will; that much of her conduct is, rather, attributable to weakness or disease of mind. Many of these things occurred before or shortly after the marriage, and they lived happily afterward. During the last of their stay together, the husband's conduct was unjustifiable and more reprehensible than the wife's. It seems likely that matters would have improved, had they continued together in patience and forbearance. *Held,* a decree of divorce for "cruel and inhuman" treatment of the husband, is not sustained.

*Appeal from Taylor District Court.*—HON. H. M. TOWNER, Judge.

SATURDAY, OCTOBER 13, 1894.

ACTION for a divorce. There was a hearing on the merits, and a decree for a divorce, as demanded. The defendant appeals.—*Reversed.*

*Charles Thomas* for appellant.

*Jackson & Miller* for appellee.

ROBINSON, J.—The parties to this action were married to each other on the eighth day of April, 1890. The petition of plaintiff asks a divorce, on the grounds of desertion and inhuman treatment. The answer denies the grounds of desertion alleged, and asks for temporary alimony. The decree of the district court gave to the plaintiff an absolute divorce, and to the defendant the custody of their child, a son, then eighteen months of age, an allowance of one hundred and fifty dollars as alimony, and the costs of suit. At the time of the marriage in question, the plaintiff was about forty-four years of age. He had been married, and was the father of three young children. The defendant was about thirty-four years of age, and had been married, but appears to have been childless. Her first marriage occurred ten years before, and she lived with her first husband ten days. She had been engaged to be married on two different occasions, on each of which the day for the marriage had been set; but both engagements had been broken. Whether she was guilty of any censurable conduct in any of those transactions does not appear. When she became engaged to plaintiff, she was living with her brother, about a mile and a half from Clearfield, and he was doing business in that place. Before their engagement occurred, the defend-

ant had known one Lee Ellerick, an unmarried business man of Clearfield, and had been visited by him; but he had never declared any affection for her, did not visit her as a suitor, and said he "didn't want to marry anybody." For more than a year before her marriage to the plaintiff, she had not been on speaking terms with Ellerick, and entertained a bitter feeling toward him, on account of an injury which she supposed he had done her; but during that time the plaintiff and Ellerick were personal friends, and their relations were unusually cordial and intimate. She and the plaintiff had talked together about Ellerick, and the plaintiff had told her that she loved Ellerick, or she would not allow his conduct to worry her, and that, if she loved him most, she should marry him. She denied the charge, and said she loved plaintiff more than she did Ellerick. A few days before the time appointed for the marriage, the plaintiff expressed to her a wish to invite Ellerick to the wedding. She consented that an invitation be given, but refused to join in it. After some reflection, she concluded that, as she was about to marry the plaintiff, it would be better to be on good terms with his friend; and, entertaining the idea of securing an amicable adjustment of the differences between herself and Ellerick, and promoting a more friendly feeling between them, she called at his store on Saturday preceding the wedding, which occurred the next Tuesday. As several persons were present she asked if she could have an interview with him. He answered in the affirmative, and wished her to name a time. She suggested that evening, but he had an engagement for that time, and it was finally agreed that they should meet where she was then residing, at her brother's house, in the evening of the next day. He visited her at the appointed time, and during the conversation they then had he said, "Maggie, I would rather you would marry Charley than any

one else, but you and I are the ones that ought to marry." She answered, "Lee, I thought you never wanted to marry me," to which he replied that he "did, but hesitated until it was too late." She then told him that if she had known that sooner, she would never have accepted the plaintiff.

At that time the plaintiff was in Bedford, to procure the marriage license. As a result of the interview, her bitter feeling for Ellerick was dissipated, and she became troubled to know what to do. It did not seem to her right to let the marriage be consummated without telling the plaintiff about her feelings toward Ellerick, and finally she decided to ask that the marriage be postponed one week. She desired that time in which to decide whether to marry the plaintiff, or to tell him that she could not marry him on account of her feelings for Ellerick, and sent a request to the plaintiff to visit her. In response to her message, he went to her on Monday. Their testimony does not agree in all respects in regard to what was then said, but we are satisfied that he was informed of her feelings for Ellerick, and that she desired that the marriage be postponed. The plaintiff expressed regret that he had not known her real feelings sooner, but said it was too late to cancel their engagement, and that it would be best not to postpone the marriage. After mutual expressions of sorrow and sympathy, it was arranged that the marriage should take place at the appointed hour, and that he should call for her at 6 o'clock in the afternoon of the next day, to take her to his home, where the ceremony was to be performed. Two hours before his arrival, she wrote a letter of considerable length to Ellerick, which was delivered to him, in which she gave a full account of her meeting with plaintiff on the preceding day, including the conversation and final arrangements, and expressed the hope

that the marriage would yet be postponed one week. The closing part of the letter was as follows:

"Oh, how I long to be free, without causing him disappointment or suffering; I now feel I must go on. I will try to do my duty as a wife; but oh, the sadness! What a blank my life will be! I can't tell you how it hurts me to think of those bitter letters I wrote you, and the way I have treated you since. If I had treated you differently, affairs might now be different. Oh, Lee, it was cruel as the grave for you to tell me what you did so late. I do not blame you, but you see my position. It is so near the time, and his need is so great. I am still praying with whole soul that heaven may open up a way even yet by which I may honorably get off. Perhaps, Charley will see this differently, and release me before the hour comes yet. It is now 4 o'clock, and I must write no more. Good-by, Lee. I shall think of you often all through life. It can't be otherwise. You have my heart, and Charley my hand.                    MAGGIE.

"P. S. I don't know how or when I will have a chance to give you this, but I will take it with me.
                                              "M. F."

At 6 o'clock the plaintiff arrived, and she returned with him to Clearfield. When she met him, he asked if she was feeling any better, and she told him that her feelings toward him were not changed; that "if anything, I felt more toward him because he suffered so." They talked about the marriage and the advisability of consummating it, and about the probability of a separation if they were married, until the hour appointed for the ceremony had passed. Finally, she told him, "if he was sure he knew what he was doing, and would rather we would go on, I would do so," and, "Charley, it is like giving up my life." He insisted that she would love him if they were married, and the marriage took place. The

assembled guests then partook of the wedding feast, while she retired to her room. After a time the plaintiff entered, sat down by her, and asked if she "loved him now;" and she answered promptly that she did not. She asked that his housekeeper stay with her that night, and he consented. The next morning she rendered the plaintiff some assistance preparatory to moving to another house, and in the afternoon she complained of being sick, and went to the residence of a neighbor to lie down, and there remained without him the next night. She said she then thought more of the plaintiff than she had ever done, but thought it could not last, and she would soon be a deserted wife.

On Thursday morning she decided to return to her brother's house, but, before going, had an interview with Ellerick, in which he endeavored to persuade her to live with the plaintiff. She answered, "Lee, he is just insane with jealousy." She went to her brother's and, after she had been there a few days, the plaintiff attempted to effect a reconciliation. He had continued his intimate relations with Ellerick, who gave him the letter his wife had written on her wedding day. He made a copy of it, and took the original to her for an explanation. He tried to induce her to return, and she felt offended because he had said in public he did not know why she had left him. At the end of two weeks she went to his home, and there resided until the next November. For nearly a week they lived happily together, and then there was trouble. He describes their life together as "rocky;" says there was no affection and no home. Ellerick was a topic of frequent conversation, and a source of constant irritation, although it does not appear that he was directly responsible for it. The plaintiff says that, whenever she met Ellerick, she was made unhappy and wild; that Ellerick would sometimes take a seat in front of his store to read the papers, and she would take a seat

where she could see him, and was continually crying. She is described as "a bundle of inconsistencies and a fountain of tears." The plaintiff claims that she was unable to attend to her household duties in consequence of her mental condition; that they lived chiefly on canned goods; and that they had no "home life," in the proper sense of the term. A newspaper published articles which annoyed him, one of which was entitled, "Is Marriage a Failure? Ask C. H. Ennis." People talked about it. Friends spoke to him frequently of it, and he claims that, in consequence of the various causes which we have enumerated, and others of a like character, his health became seriously impaired; that his weight was reduced twenty pounds; and that he became unable to do business. About the first of November, 1890, he sent his children from his home, but he continued to stay there nights, although he and the defendant occupied separate rooms. In the latter part of the month she left him, and they have not lived together since, and he has contributed nothing to her support, excepting to pay the expenses of her confinement, in June, 1891.

There is no ground for claiming that the plaintiff was deserted by the defendant. When they finally separated, she left him reluctantly, and because she felt compelled to do so by his conduct toward her. We do not understand the plaintiff to claim that the evidence sustains the charge of desertion. Section 2223 of the Code authorizes a decree of divorce in favor of the wife when her husband "is guilty of such inhuman treatment as to endanger" her life, and he is entitled to a divorce for a like cause. The question of chief importance which we are required to determine is whether she has been guilty of such inhuman treatment as to endanger his life. It must be admitted that her conduct was in some respects extraordinary

and wholly inexcusable. She has shown much fickle-ness and indecision of character, and has been most unreasonable in many things. But the plaintiff had reason to know her character in these respects before he married her. The unpleasant notoriety which was caused by her conduct immediately after the marriage and her feelings toward Ellerick were fully understood by him when he persuaded her to return two weeks after the marriage. At that time it was agreed that the Ellerick matter should not thereafter be mentioned, but neither party seems to have carried out the agree-ment fully.

Within a short time after her return, the want of affection between them and the advisability of a sep-aration were talked about, and were the subject of frequent conversations from time to time until she finally left him. He became desirous of a separation, and consulted an attorney in regard to it. We are sat-isfied that, during the latter part of the time they lived together, he contributed his full share to the unhappy condition in which they lived, and that he was not blameless at any time. Her foolish infatuation for Ellerick was naturally a cause of distress for the plain-tiff. That she was weak to permit it to influence her as it did is true, but she is not guilty of all with which he charges her, and what she did was without any ill will or malice toward the plaintiff, and to a considera-ble extent was due to causes beyond her control. She did nothing willfully to distress him, but acted more like one of a weak or diseased mind, who needed care and protection. The plaintiff was of a sensitive and jealous nature, and the conduct of his wife troubled him greatly, and to some extent impaired his health. But that might have been the case had she become insane after their marriage, or had she suffered great bodily affliction, and he had been taxed beyond his strength to care for her. Such causes of ill health as

those do not constitute "inhuman treatment," within the meaning of the statute. *Tiffany v. Tiffany*, 84 Iowa, 127, 50 N. W. Rep. 554. Acts of physical violence are not necessary to constitute inhuman treatment. *Doolittle v. Doolittle*, 78 Iowa, 692, 43 N. W. Rep. 616. But treatment, to be inhuman, must be willful, and not merely the result of sickness, nervous derangement, or other weakness, for which the party guilty of it is not responsible, and which deprives him of the power of self-control. 5 Am. and Eng. Encyclopedia of Law, 789, and cases therein cited; Browne, Div. and Alim. 101. There were never any acts of violence nor quarreling nor abusive language between the plaintiff and the defendant. She did not misuse his children, excepting as she may not have been sufficiently careful to provide for their wants. Each party manifested forbearance and consideration for the other to an unusual degree. If the claims of plaintiff were conceded to be well founded, it would not follow that he is entitled to the relief he asks; but we are satisfied they are not sustained by the evidence. Many of the things of which he complains occurred before she went to his house, two weeks after the marriage, and others occurred within the next three months. During the last half of the time they lived together, his conduct was more reprehensible than hers, and during the last few weeks of that time he was guilty of conduct toward her for which there is no justification. Ellerick had offended her by censuring her course, and she had ceased to regard him as highly as she did at the time of the marriage. Her feelings for the plaintiff became more nearly what he had a right to expect when she learned that she was to give birth to a child. We are inclined to believe that there had been an improvement in those matters of which the plaintiff had most cause to complain before the separation, and that, had they continued together with patience and mutual forbearance, the larger part of their troubles

would soon have been over.  However that may be, the law does not give to either party to the marriage relation a divorce because the other does not behave in all respects in a reasonable and proper manner. We conclude that the plaintiff has failed to show himself entitled to relief, and so much of the decree of the district court as granted him a divorce is REVERSED.