HENRY BOSVELD, Appellee, v. ANNA BOSVELD, Appellant.

No. 46153.

FEBRUARY 16, 1943.

1200

McCoy & McCoy, of Oskaloosa, and Johnston & Shinn, of Knoxville, for appellant.

H. S. Life, of Oskaloosa, for appellee.

SMITH, J.— ■ Appellee brought this suit for divorce from appellant on the ground of cruel and inhuman treatment. Stated more specifically he, in effect, alleged: nagging and fault-finding by appellant in the home and elsewhere; accusations of infidelity by appellant against him; fits of anger in which appellant would run from home in her night clothes and remain away for many hours at a time; "actual or pretended" attempts by appellant to commit suicide—once by drinking lysol and another time by the threatened use of a "large and very sharp butcher knife"; invitation by her on separate occasions to two men to have improper relations with her; and on one occasion the making of a statement to another woman that she would like to have improper relations with certain men.

Appellant denied generally and filed cross-petition for separate maintenance on the ground of cruel and inhuman treatment consisting of alleged improper relations with other women; the conduct of appellee in excluding her from the family home and preventing her from entering same; his refusal to allow her to see her children; physical violence committed by him against her, consisting of choking her shortly before her last child was born; and his conduct in forcing her to get into a car, bending her arm back and hurting her on the occasion of taking her to a hospital in Michigan.

A large number of witnesses was examined, most of them, naturally, being relatives or friends of one or both parties. There is the usual showing of prejudice and partisanship by witnesses on both sides.

The undisputed facts show that appellee and appellant were married December 5, 1929; that one son was born in 1931, one in 1933, and a daughter in August 1939. Appellant had a miscarriage three or four years before the daughter was born.

They resided in Peoria, Mahaska county, Iowa, and were members of Christian Reformed Church. It seems to be a principle of the church to take charge of trouble that arises and to try to keep the parties out of court. Appellant's father and brother belonged to another denomination. This possibly was the cause of some lack of complete sympathy between appellee and appellant.

One gets the impression in reading this record that appellant was always high-strung and had a quick and uncontrolled temper. Also, that after her miscarriage, which was around 1935 or 1936, her condition in that respect was worse.

There seems no doubt that latterly, at least, she was guilty of faultfinding concerning her husband's long hours of work and inadequate pay and their resultant low standard of living. She may have been unwise in carrying it to the degree indicated by the record. She frankly admitted much of the so-called nagging though denying the appropriateness of the word. She complained of not having needed utensils and conveniences at home, and of other hardships which she thought could be avoided if appellee sought more lucrative employment.

She makes no denial of the butcher-knife incident:

"I recollect about grabbing a butcher knife, but I couldn't help it. * * * I never said anything, just ran out of the house. * * * I do not know much about what took place until I was at Abbott's hospital."

There may be some significance to the fact that her husband took her to the hospital on that occasion instead of blaming her for her acts. He evidently considered that she was a subject for medical treatment.

It is also significant that after each attempt at suicide (or "pretended attempt," according to appellee) the appellant was taken to a psychopathic hospital or sanitarium. In December 1939, she took a dose of lysol. After being cared for at home for a period of approximately two weeks she was taken

to the Christian Psychopathic Hospital at Grand Rapids, Michigan. Again, after she had been home from the hospital about three months the butcher-knife incident occurred and she was again promptly taken back to Grand Rapids (September 1940) and remained there till January 1942. The hospital was maintained for the mentally afflicted people of the church to which appellee and appellant belonged and incidentally any others "who care to come."

We are impressed by this record with the fact not only that hers was a mental case but also that her husband and associates so considered it. Two witnesses testify, apparently referring to two entirely separate occasions, that they saw her on the street, late at night, dressed only in her night clothes. She denies these incidents. Assuming they happened, they indicate an abnormal mentality rather than a malicious attempt to disgrace or annoy her husband.

The morning after the knife incident, when appellant resisted being taken to Michigan, appellee by force put her into the car. She says: "He pushed me in the car and kissed me goodbye." He has not denied this testimony. It indicates that up to that time the husband considered her irresponsible rather than blameworthy. He knew the hospital to which she was being taken was for mental cases.

Dr. Abbott of Oskaloosa testified:

"The diagnosis showed she had flu of the base of the brain affecting her nervous system and she was very nervous and having slight hallucinations * * *."

The testimony of the two men as to having received improper proposals from appellant, if true, indicates strongly that her mental condition was affected. Forthright proposals such as they relate, without any preliminary incidents or overtures leading up to them, are not indications of immorality so much as of irresponsible mentality. She denies that evidence in toto.

Mrs. Hoitenga, the pastor's wife, took appellant to the Grand Rapids institution the first time and, with Rev. D. J. Hoitenga and others, also accompanied her there the second

time. She testifies: "I remember when she had a miscarriage. That always gave her a good deal of trouble after that."

Rev. D. J. Hoitenga says:

"Mrs. Bosveld has been taken to a psychopathic hospital a few times and I have considered Mrs. Bosveld from my observation of her, as being a bit immature because her mind was at a standstill in the process of development. * * * I believe there are indications and I have reasons for it, why I say that her mind is not perhaps altogether up to normal."

There is much evidence that defendant was deeply attached to her children. We shall not attempt to review it in detail. Reverend and Mrs. Hoitenga expressed that opinion. Mrs. Abbott, the doctor's wife, so testified. The doctor himself testified that after her return from Michigan (the second time) "she seemed to be perfectly normal to me, only she had a great fear of something happening, she was going to lose her children, that was the thing she talked about mostly."

We are not unmindful of the fact that various witnesses testified that appellant swore at the children, that she neglected them, that they were untidy and ill-kept. Other witnesses gave testimony the other way. As to the matter of alleged untidiness of the children as well as of the housekeeping, it is possible the pastor's wife, Mrs. Hoitenga, correctly explains the conflict in opinion:

"Have been in her home a couple of times, and frequently seen the children. As a housekeeper, according to the standard of Peoria, I wouldn't say she measured up to Peoria cleanliness. Q. That is because the Dutch people are very clean? A. Yes."

It is never possible accurately to untangle and appraise the complicated affairs of a family, extending over a period of years. Witnesses see it from different viewpoints and angles.

The evidence shows that appellee never contemplated divorce until sometime during appellant's second confinement in the psychopathic hospital. She was taken there in September or October 1940, and he visited her the following June. He testifies that up to that time he had no idea of divorce. He ex-

plains his subsequent decision as follows, in answer to a question on cross-examination:

"All right, that is easy. With reference to explaining, the day I was there I was nagged from morning to night, as long as I was there. Q. Up at the hospital? A. Yes, and accused all day long and I came home dead sick. Q. That is when you began to think you didn't want her any longer? A. I says, 'That is the last of it.'"

There is no evidence of what the "nagging" was about on that occasion, and no corroboration.

We have set out the evidence in considerable detail in an effort to give some picture of this difficult situation. What we have shown is still quite inadequate. The case is sad for all parties concerned. Both appellee and appellant have been at fault and both have been victims of ill-health contributing to their marital troubles. We do not believe the trial court has correctly solved the problem.

The line of demarcation between inexcusable, unbridled temper and actual insanity for which the victim is not responsible cannot be exactly determined.

We do not in this case have the benefit of any expert opinion on this question except that of Dr. Abbott of Oskaloosa who testifies to no special qualification except to say:

"I am a physician and surgeon. I am a graduate of a medical school, Kentucky School of Medicine, Louisville, Kentucky. Have been practicing medicine in this county since 1893. Have what is called Abbott Hospital. Have had experience with nerve disorders or disease."

We have briefly set out his testimony along with that of some lay witnesses.

There is also in the record, apparently without objection, the letter of Dr. Mulder, superintendent of the sanitarium in Grand Rapids, written to appellee under date of December 17, 1941:

"Pine-Rest Sanitarium
And
Christian Psychopathic Hospital
Grand Rapids, Michigan
December 17, 1941

Mr. Henry Bosveld
Pella, Iowa, R. 2
Dear Mr. Bosveld:

Mrs. Bosveld has been physically well the past two months. She ate and slept well, was dressed daily and assisted at times with the work.

Mentally she is changeable. At times she is at ease and pleasant; at others depressed, complaintive and annoying.

Yours for the Cause,

J. D. M.

J. D. Mulder, M.D. Supt.''

I. There is no doubt as to the rule in this state that insanity is not a ground for divorce, or that a charge of cruel and inhuman treatment cannot be based on acts attributable to insanity. Tiffany v. Tiffany, 84 Iowa 122, 127, 50 N. W. 554, citing Wertz v. Wertz, 43 Iowa 534. This court has even gone further:

"But treatment, to be inhuman, must be willful, and not merely the result of sickness, nervous derangement, or other weakness, for which the party guilty of it is not responsible, and which deprives him of the power of self-control.'' Ennis v. Ennis, 92 Iowa 107, 115, 60 N. W. 228, 230.

See, also, Bethel v. Bethel, 181 Mo. App. 601, 164 S. W. 682.

We appreciate that each case must stand on its own peculiar facts. No one decision can be a perfect precedent for any other. But the Ennis case is some authority for what we conceive to be the correct decision here. We think the court erred in holding appellant guilty of cruel and inhuman conduct.

II. That part of the decree which dismisses appellant's cross-petition is correct. There is no evidence to sustain her allegation of improper conduct of appellee with other women. The allegation of physical violence, consisting of choking, is

testified to by appellant but is uncorroborated. We do not find that appellee has denied it. It occurred three years before the trial. Appellant's own testimony in regard to it does not make it appear serious. It was followed by prompt apology. She says: "He washed my face and he said, 'Mother, I didn't mean to do it. I apologize.'"

The incident when he forced her into the car to be taken to the hospital in Michigan the second time has already been commented on. Assuming the propriety of sending her back, it does not appear that appellee used any more force than was necessary to accomplish it. Appellee and the other witnesses were all acting on that assumption, and appellee's treatment of her apparently did not impress the pastor and his wife as being unduly cruel under the circumstances.

Her other allegations relate to appellee's conduct after her return from Michigan the last time, and after he had decided on divorce proceedings, and to the act of bringing the divorce action itself. He excluded her from her home and children. This conduct was unduly harsh, but two things must be observed in regard to it: First, at that time appellee himself was far from well, due, probably, in part to the marital trouble; and second, the treatment is not shown to have affected appellant's health or endangered her life. The evidence affirmatively shows the contrary.

The bringing of this divorce action was unwise and we have held the charges made therein against appellant were not sustained. We are not prepared, however, to hold that these facts are sufficient to warrant a decree in appellant's favor.

It appears that appellee has not answered or replied to appellant's cross-petition. That cannot change our decision on this branch of the case. The interest of the public in divorce proceedings is well established and the case was fully tried here on both sides, even if appellee could be said to be technically in default for want of such pleading.

The court correctly denied appellant's cross-petition for separate maintenance.

These parties have been unfortunate. Undoubtedly appellee has endured much on account of appellant's mental state. His own disposition and conduct seem to have reacted unfavor-

ably upon his wife. There must also be taken into consideration the peculiarities and standards of the community.

We have given the case our most careful attention. We have considered the fact that these parties have three minor children, the daughter only four or five years old. They need the care of both parents.

The evidence does not, in our opinion, justify a decree of separation in favor of either party.

The decision appealed from is sustained as to the part that dismisses appellant's cross-petition, and in all other respects is reversed.—Affirmed in part; reversed in part.

All JUSTICES concur.