ANNA HELMICH, Appellee, v. CLARENCE HELMICH, Appellant.

**DIVORCE:** Cruel and Inhuman Treatment—Evidence. Evidence reviewed, and held insufficient to establish cruel and inhuman treatment.

·Headnote 1:  19 C. J. p. 142.

*Appeal from Webster District Court.*—SHERWOOD A. CLOCK, Judge.

JANUARY 20, 1925.

SUIT for divorce on the ground of cruel and inhuman treatment. There was a decree for the plaintiff. Defendant appeals. —*Reversed.*

*Healy, Thomas & Healy,* for appellant.

*Mitchell, Files & Mulholland,* for appellee.

EVANS, J.—The parties were married on January 11, 1921. The wife was at that time about twenty-four years of age, and the husband was two years younger. For more than three years previous to their marriage, they had both been engaged in the service of the same corporation, and they had become well acquainted through an ardent courtship during that period of time. Both were industrious, and each was earning a good salary. The parents of each of them lived in Fort Dodge. The young couple set up their first housekeeping in the upstairs rooms of the Helmich home, the lower story of the home being

occupied by the groom's parents. In November, 1921, a son was born to the marriage. The young husband was the only child of the Helmichs, and the new arrival was their only grandchild. This housekeeping of the young couple's lasted for one year and a half. By this time, the wife and her mother-in-law had so operated upon each other's nerves as to result in open war. Thereupon, the young husband rented a near-by house, and moved his family into it. This was occupied for a month. It was too near the parental home. The family moved into another residence sufficiently distant on the west side. Two months or more thereafter, this house was sold, and this resulted in the removal of the family to a home in Highland Park. This occurred in October, 1922. On May 10, 1923, the wife left this home suddenly and without warning, and shortly thereafter instituted this suit. In the afternoon of that day, the husband unexpectedly came home during business hours, and there found his wife and her mother busily engaged in packing, preparatory to her removal from the house. This was his first knowledge of her existing purpose. He protested. He took the baby into his arms. The wife and her mother protested, and a struggle ensued over the possession of the child. After a momentary struggle, the husband maintained his possession of the child, and took him to the Helmich home. The wife proceeded with her packing, and moved to the home of her parents. At supper time of the same day, she went to the Helmich home, accompanied by a policeman, and received the child from her husband, who planted a final kiss both upon the babe and upon the mother.

One feature of the case is that the larger part of the record of the evidence is devoted to the troubles between wife and mother-in-law. These troubles antedated the date of separation by more than ten months. Concededly, the husband is a sober, industrious young man, making good headway in his business. Concededly, also, the wife is industrious and efficient. The charge of cruelty made by the plaintiff against her husband is very emphatic and sweeping. Her testimony, however, is deficient in details, and quite regardless of chronology. For instance, the struggle of May 10th over the baby is repeatedly incorporated into her evidence at every stage of the story, without

any regard to the chronological order of the events. Her following initial testimony is sufficiently illustrative of it all:

"Well, from the very beginning, his mother treated me terribly. And everything she did, he thought was all right, and stuck up for her. He would grab my wrists and twist them, and twist my arms, and he did the same thing over, and struck me at different times, and she has struck me, and he has, too, until I couldn't stand it any longer; and when we went in there, and we were in that place when it wasn't furnished,—it had not been plastered then, and it was not finished at all, and I had to scoop plaster off the floor to make it possible to live in; and two weeks after that, his mother tried to choke me to death. So we had to move, and I said I was going to start proceedings against him, and I started divorce proceedings against him at that time; because it was plain to be seen he was sticking up for her. We lived upstairs, and Mr. and Mrs. Helmich, Sr., lived downstairs, and each family cooked for themselves. Two separate establishments were maintained. His mother came up to visit me sometimes. I would go down to see her when my husband went down.

"Q. What did your husband do to promote friendly feeling between you? A. He forced me to give in to her every time. I had to give in to her whims. Didn't have any consideration for my feelings whatever. On one occasion, when his mother called me names,—called me everything she could lay her tongue to,—and when we talked about it, he got hold of me and took a big chunk of meat out of my hand, and twisted my wrists and tried to break them, and forced me to go down and speak to her. Then he took a shotgun out of the closet, and jerked it up at me, and threatened my life if I wouldn't speak to her. Q. What did he do at the time he took the shotgun out of the closet? What did he tell you he would do? A. I told him that he could go,—that I wouldn't speak to her at this time; and he grabbed me by the wrist and jerked me downstairs; and his father put his arm around me and coaxed me so hard that I made up with her. He threatened to shoot me if I didn't go downstairs. He said, if I didn't make up with his mother, I was cheated out of $30,000; and I said, if she wanted to disinherit me, let her. I said we had a good start, and we could

get property, and didn't need her money; and he then took the gun out of the closet, and said he would put us both under the sod if I wouldn't promise to make up with her. He grabbed me by the wrist and jerked me down the stairs; and after I made up with her, she was just the same,—the same thing over and over. This happened at the time the shotgun was taken out of the closet. And there was no occasion for any quarrel at all; but she would go at me, run upstairs at me, and grab my wrist, try and knock me down; and my husband and his father usually held her; and it took all their strength to hold her, always. My little sister was there one Saturday, the first time she tried to strike me, and she ran upstairs, passed the two little children that were playing with the baby, and jumped on me about it, and came to the door and called them to stop the noise, and kept grumbling about me; and she would say I wasn't doing right all the time. I told her I could take care of the girls pretty well. My husband was working at the cellar of the new house at that time. I made up my mind I would tell him, and see if it would come to something; and I told him. And she jumped all over me, too. When he came home and came in the house, she came upstairs and had one of her awful spells; and they had to hold her arms, or she would have struck me. My little sister gave a scream, and ran in front of me; and she took her fists and hauled off and hit her between the eyes, and took a big chunk of meat off her nose. This was in the spring of 1922. The baby was a few months old. A few days before we moved into our new place, I came downstairs, and Mrs. Helmich and her sister, Mrs. Schroeder, were talking about things. Mrs. Schroeder was running down her stepdaughter, and Mrs. Helmich was running me down. I came to the dining-room door, and they changed the subject; and right then they proceeded to again begin talking about me where I could hear them. I stood there a second, and she got mad, got right up and grabbed my wrists, and started pushing me into the dining room, where I was fighting to get my wrists loose. My sister came running to the door, and then Mrs. Helmich got smart, and took me by the wrists and jerked me until I thought she would break them. She threw me on the floor, and I had a headache for several days. She ran upstairs several other times and tried to get a hold

of me, when Clarence and his father protected me. This happened about three or four times while we lived at the old folks' home.''

The foregoing evidence is greatly weakened in its material assertions by consideration of plaintiff's examination as a whole, and in the light of the whole record. We find her evidence to be replete with inconsistency and much self-contradiction. That the sweeping accusations made by her against her husband in certain portions of her testimony are great exaggerations, is undeniable. Her real grievance against him is that he was not sufficiently aggressive against his mother, and she suspected that he still retained a lingering affection for her. The defendant denies,explicitly that he was ever guilty of violence toward his wife; and her assertions to the contrary have no corroboration. It is conceded that, on two or three occasions, they engaged in a quarrel of words. It appears, also, that both of them have a certain gift of profanity. This doubtless scintillated best when the conversation was warmest. The plaintiff concedes her use of profane speech, both towards her husband and towards her mother-in-law. Other evidence discloses more than she concedes. Her explanation is that her profanity was responsive only. The following excerpts from her cross-examination will furnish some aid to an appraisal of her charges:

''I am normal mentally. I don't bear my husband any ill will. I just want the right thing done. I don't hate my husband, but I have no affection for him. I certainly can't love my mother-in-law very much. I have a suit against my mother-in-law in the district court of Webster County, Iowa, for $20,000 damages. * * * Q. But you criticize— A. I do criticize, and I use slang. Q. What words did you use when you swore at your husband? A. I said 'fool' back to him. When he called me a fool, I called him a fool, too. If he said 'Damn it,' I said 'Damn it.' That is what I said. I didn't want him to take my baby away, and I wanted to protect my baby. That is the particular thing that I want the court to consider as against my husband, and the outstanding thing in my direct testimony. My baby is two years old; in good health. When the policeman and I went to my husband's mother's home, the policeman, Mr. Tierney, asked if there was a baby there. Clarence came in,

with the baby in his arms. They got a sweater on the baby, and got him ready. My husband said I could have the baby, and he handed me the baby. He kissed the baby good-by, *and had the nerve to kiss me.* We then left the John Helmich home, and I have not been there or to my husband's home since May 10, 1923. * * * I remember my attorney, Mr. Mitchell, preparing a paper for my husband's mother to sign, wherein she acknowledged that she was responsible for the trouble which arose between my husband and myself. I do not have a copy of that paper. That paper was prepared the last of October, 1922. I told my husband, *if his mother would sign the paper, I would live with him; and that, if she didn't, I wouldn't live with him.* That paper was made out for my safety. His mother was sitting under my windows all the time, listening, and crawling around the house; and that was why the paper was made out. * * *

"Q. Now, at that time, did your husband strike you? A. Did he strike me? Q. Yes. A. Yes, he did. He grabbed me by the throat, and knocked me down. Q. Did he strike you? A. Well, he grabbed me by the throat. At that time that he grabbed me, he was holding the baby in his left arm. I was hanging onto the baby. There was a scuffle, as I wouldn't let the baby go. My mother tried to get the baby, and he struck her. He took me by the throat, but struck my mother. My mother had been in the home, packing my personal belongings, for a half hour before he came. My mother and I never cuss. This was about 2:30 in the afternoon. My husband was not expected home until around 5:30 or 6 o'clock. He came home rather unexpectedly, and found my mother and I packing. When he came, the baby was standing beside me. The baby ran over, after he grabbed mother by the arm. I walked over, to take the baby, and he grabbed me by the throat. * * * I was going to pick up the baby, when my mother-in-law reached down and knocked me off the porch, and picked up, the baby. I said to my mother-in-law, 'Give me that child. I can take care of my own child.' My mother-in-law spoke first. She called me a narrow-minded little fool. I said nothing. At that time, my husband was working down town. He had nothing to do with it, and wasn't there. Q. You don't want the court to understand that you believe that Clarence had anything to do

with his mother's conduct that morning, do you? A. Well, I don't know. He stuck up for her. Q. Did you ever hear him criticize his mother? A. No. Q. Did he ever criticize you? A. No. Q. Do you know whether or not your husband ever criticized you to his mother? A. I have seen him talking to her very confidentially, but I never overheard it. I don't remember ever hearing a word. * * * Q. Isn't it true, and don't you know of your own personal knowledge, that your husband is not responsible for anything that his mother may have done to you or said about you or said to you? A. Well, she wouldn't have gone as far as she did if he hadn't encouraged her. Q. Do you know that of your own personal knowledge that Clarence ever did—ever planned any single act towards you? A. No, I don't know that. Q. Of course you don't, and you don't want the court to so understand, do you? A. Why, no, I don't know anything about it. I always told my husband he ought to be a man,—enough to take me away from there; and he always said, 'Just wait until we get our own house. You can stand it until we get our own place.' That is why I always took everything. Then we moved into the house next door, then to the west side, and then to the house on Highland Park Avenue. Q. Now, did your mother-in-law ever come to the Highland Park residence? A. Not that I know of, unless she has been outdoors. I didn't want her there. Clarence and I went to the house on Highland Park Avenue and lived there for ten months. During that time, my mother-in-law never came around at all; but my father-in-law was there once. He never interfered with me. My father-in-law is quite deaf. Q. You then had some trouble at the Highland Park residence with your husband, didn't you? A. Well, he was gone all the time. He didn't stay at the place, and I was just scared to death nights, and he would laugh at me when he came home. My husband told me he was out making washing machines demonstrations, and I didn't believe people were sitting up doing that until midnight. I knew my husband was a commission salesman for the Fort Dodge Gas & Electric Company, and I knew that he was selling machines to all kinds of people,—people who worked during the daytime. My husband told me that. Q. Now, you wanted your husband home, didn't you? A. Why, yes. Q. I thought you said, a few min-

utes ago, that you had to have some protection; that you had to leave him for your safety. A. Well, after I found him out, —certainly. I found him out when we moved to the west side. We moved to the Highland Park residence, and lived there a considerable period of time. We didn't live happily at the Highland Park Avenue residence. Q. What did he do? A. Well, usually he wouldn't take,—he would not be there to dinner; and he would call up and say he would be there; and when I would have dinner ready when he said he would be there, he would call up and say he would be there just a little late; and finally I would put the dishes away. * * * Q. Now, Mrs. Helmich, I don't want to keep you on the witness stand very much longer, but I wish you would tell the court when you first got the idea of commencing an action for divorce. A. Well, after we got on the west side. He was awfully sneaking about everything, and he always had an excuse for everything—even if I did speak to him all right—I didn't know exactly whether he was in with her or not—until at the last. I finally concluded—it got worse and worse; and then I just knew he was in with her, and he was trying to force me to leave him. He tried to force me to leave without the baby. By 'her' I mean his mother. I knew it. It was his actions. I have never seen people talking on the street corner about me, or felt that they were talking about me. At the time that my husband abused me and twisted my wrist, he apologized to me. * * *

"Mr. Mulholland: Q. Where was your husband at the time of the assault that you have referred to? A. He was working. He came home about 5:30. He didn't know about it. Q. What did he do about it, in connection with your condition, when he returned home that evening? A. Well, he went downstairs and told them to leave me alone.

"The Court: Told whom?

"A. Told all of his relatives and his mother."

The foregoing is a sufficient indication of the general character of plaintiff's evidence as witness. It is so characterized by generalities and by the mixing of events that only a careful and laborious reading enables us to analyze it at all. Our analysis thereof brings us to the conclusions hereinafter stated. These parties lived together for two years and four months. The trou-

ble between the wife and mother-in-law began in the spring
of 1922, shortly before the young couple moved out of the Hel-
mich home. According to the plaintiff, there were three or four
specific altercations between her and her mother-in-law. These
were extended over a period of only a few weeks. None of them
occurred while the young couple were living either at the west
side or the Highland Park home. None of these altercations
occurred in the presence of the husband, nor was he ever in
any manner to blame for them. The controversy between the
wife and the mother-in-law was as foolish as it was unfortunate,
and was discreditable to each of them. Either one of them
could have wholly avoided it by a very moderate amount of for-
bearance. This record will not permit us to say that the plain-
tiff was any less to blame therefor than was her mother-in-law.
Both were seriously to blame, and both were irritable, aggressive,
and combative. The mutual hostility of these two becomes the
key to all the evidence in this case. The manifest objective of
plaintiff's evidence has been to involve her husband in responsi-
bility for the past conduct of his mother. Such also had been
the manifest purpose of the plaintiff for the ten months last
preceding the day of separation. With his wife and mother in
deadly hostility, the young husband was put between the upper
and the nether millstone. Did the plaintiff properly recognize
the difficult position into which the husband had innocently
come, and did she demean herself toward him as a dutiful wife
ought to have done? She was older and more mature than he.
She knew that she was putting him to a very hard alternative.
In our appraisal of her conduct toward her husband, we confine
our consideration of the evidence to the last ten months of their
living together. During that period, there had been no intru-
sion of the mother-in-law.

For instance, in October, 1922, she required of her husband
that he obtain his mother's signature to a certain proposed writ-
ing. She employed an attorney to prepare such writing. It
purported to be a written admission by the mother of wrongful
conduct on her part, and responsibility for the troubles of the
young married couple. It included also some sort of a promise
by her of future conduct. The obtaining of the mother's signa-
ture to this paper was imposed upon the husband as a condi-

tion to the plaintiff's living with him. The defendant took the paper, and was unsuccessful in obtaining his mother's signature. This failure resulted in bitter language by the plaintiff, which was not responded to by defendant.

Another instance: In 1922, she planned to attend a party at Storys', with some girl friends. It was to be an announcement party. Her girl friends called for her at about 8 P. M. Her husband was at home, and proposed to take care of the baby while she was gone. She refused to consent to this arrangement, because she feared that her husband might take the baby to the Helmich home. This was the reason she gave in the presence of her girl friends. No assurance or remonstrance would satisfy her. She finally declined to go to the party, because she could not well take the baby there, and because she would not leave him with her husband, for fear that the latter might exhibit him to his grandparents in her absence.

In her cross-examination, plaintiff was asked to state any particular event during the last ten months of her living with the defendant upon which she predicated complaint. Her testimony shows that her only complaint of her husband during that period of time was that he came home late in the evenings, and was frequently, if not usually, late for dinner. She professed to distrust all his explanations (which were reasonable enough), and professed to believe that he had spent some of his time visiting with his mother. The defendant owed loyalty to his wife, even against his mother; but she was under like duty of reasonableness toward him, and it was manifestly unreasonable on her part to make her quarrel with his mother an occasion of persistent torture of her husband. Upon this record, we reach the conclusion that at no time prior to May 10, 1923, did the defendant ever inflict personal violence upon the plaintiff. We are satisfied that this approximates the very truth, though it would be sufficient to find that there is no corroboration of any such alleged violence; and this is true as to the alleged threats of the defendant on two occasions. An analysis of plaintiff's own evidence satisfies us that the defendant has always demeaned himself more kindly than the plaintiff has. He has at all times pleaded with her and professed affection for her, and has demeaned himself after the separation with much con-

sideration. On the other hand, she has professed unequivocally a want of affection for him, and has upbraided him continually because she suspected that he had a remnant of affection left for his mother. A boy of twenty-two ought to be judged charitably for such a fault, and even an injured wife ought to be able to recognize that fact.

The pendency of plaintiff's damage suit against her mother-in-law is a circumstance which cannot be ignored. How influential it may have been, to prevent a wholesome adjustment of these marital difficulties, can only be conjectured. The bringing of such an action was necessarily a cruel blow to her husband. When she determined to bring such action, she likewise determined to abandon her marriage relation. She herself recognized the incompatibility of the marriage relation with the maintenance of such a suit. She staked her marriage upon such damage suit, and sold the birthright of her son for that mess of pottage. This is the only explanation apparent in the record for the sudden culmination of her married life. The husband had no warning of her intent to leave. No recent event had happened as a cause for it. The events which have been marshaled in evidence as the purported cause thereof were all more than ten months old. The mother-in-law had been eliminated from all contact. The struggle had on the last day, over the possession of the baby, had nothing to do with the formation of such purpose. The mother-in-law was a past event, though the pain of injury remained. But by her elimination, the statute of limitations was rapidly running in her favor. The plaintiff was being put to the choice, on the one hand, of a damage suit, and on the other hand, of a continuance of her marriage relation. She chose the former, and it was a sordid choice.

It may be judicially confessed that, in the consideration of a divorce case, the judicial mind starts with a stealthy presumption of fact, in favor of the wife; and this because she has presumably more at stake in her marriage than the husband has. In our approach to this case, the plaintiff has had the full benefit of that presumption. But a careful reading of the record has made this unfavorable impression upon our mind, and we are unable to avoid the conclusions herein announced.

We think that the plaintiff has failed to prove cruel con-

duct on the part of her husband, within the meaning of the statute, and that her own conduct toward her husband has been unreasonable, and therefore blameworthy.

As to the personal quarrels between husband and wife, they were both to blame, and each of them owes forgiveness to the other therefor. They were few in number, and in no event were they such as to warrant a divorce to either party. What both parties need is a "forgetting the things that are behind." Their lives are bound together and sealed by the little son, who is equally loved by both of them. To break the bond without sufficient legal reason would be a wrong to the child, to say nothing of the mutual rights of the parties themselves, or of the public interest, or of the evil influence of a bad judicial precedent.

The decree entered for the plaintiff must be and is, accordingly, reversed.—*Reversed.*

Faville, C. J., and Stevens, De Graff, and Vermilion, JJ., concur.