NOEL R. PERRY, Appellee, v. BEULA P. PERRY, Appellant.

**DIVORCE:** Cruelty—Corroboration—Evidence.   Evidence held wholly
insufficient to establish the acts of cruelty pleaded, and equally in-
sufficient to constitute proper corroboration if such acts were treated
as proved.

**Headnote 1:** 19 C. J. pp. 134, 142.

*Appeal from Union District Court.*—A. R. MAXWELL, Judge.

MARCH 10, 1925.

ACTION for a divorce. Prayer of petition granted and de-
cree entered. Defendant appeals.—*Reversed.*

*E. L. Carroll, Hunt & Chittenden,* and *O. M. Slaymaker,*
for appellant.

*Johnston & Boone* and *George A. Johnston,* for appellee. ·

DE GRAFF, J.—On October 18, 1923, plaintiff filed his peti-
tion for a divorce, predicated on the statutory ground of cruel
and inhuman treatment, and on March 17, 1924, obtained a de-
cree.   The defendant on this appeal challenges the sufficiency
of the evidence to sustain the decree entered.   With this con-
tention this court agrees.

Plaintiff and defendant intermarried January 23, 1923,
and at the time of the trial, each of the parties was about 22
years of age.   Plaintiff was employed as a locomotive inspector
in the Burlington shops in Creston, Iowa, and earned approxi-
mately $170 per month.   Plaintiff weighed about 140 pounds;
the defendant wife, 106 pounds, and "is about up to my [plain-
tiff's] shoulder in height."   After the marriage, and until May
1, 1923, they lived with the wife's mother in Creston.   They
then went to live in what is termed the Patt Flats, remaining
about a month, when they returned to the home of defendant's
mother, and continued to live there until plaintiff left, on
October 11, 1923.

Two questions arise on this record: Has the plaintiff sustained the allegations of his petition by the preponderance of the evidence? Is the testimony of plaintiff corroborated, within the purview of the statute? Two factors must be considered in making answer: (1) the language and intent of the statute, and (2) the record facts applicable thereto. The statute provides that the husband may obtain a divorce from the wife when she is guilty of such inhuman treatment as to endanger the life of her husband. Sections 10475, 10476, Code of 1924. Furthermore, no divorce shall be granted on the testimony of the plaintiff alone. Section 10474. With these provisions we are concerned in the instant case. Here the husband is plaintiff, and he must present a case of violence and mental suffering injuriously affecting him. 19 Corpus Juris 142, Section 367; *Moir v. Moir*, 182 Iowa 370; *Helmich v. Helmich*, 199 Iowa 267; *Cole v. Cole*, 23 Iowa 433. Plaintiff, therefore, must fail unless the evidence of alleged cruelty charged to the wife caused the impairment of his health or endangered his life, with reasonable apprehension of danger in the future. *Knight v. Knight*, 31 Iowa 451; *Veeder v. Veeder*, 189 Iowa 912. We therefore pass to the record, to discover the facts which sustain, or tend to sustain, the plaintiff's claim that the defendant "has treated him in such a cruel and inhuman manner that his health has been injured and his life endangered thereby."

Two acts of alleged cruelty are involved, the first of which is claimed to have occurred immediately prior to the return of the parties to live in the home of the wife's mother. The plaintiff testified:

"My wife said she was going back there whether I did or not, and said I had to go along with her. She kept arguing; and her temper got the best of her; and she started in kicking me and pulling my hair; and she got to quarreling about the furniture, and said it wasn't fit to use; and she had a butcher knife when she commenced quarreling, and she cut up the davenport; and I took hold of her and told her to cut that out; and she said: 'Let go of me, or I will cut you.' I took the knife away from her. She cut the varnish off the library table."

This happening is positively denied by the defendant, and there is no corroboration whatsoever of this occurrence. Shortly

after this transaction, the plaintiff and defendant moved to the home of the wife's mother, and there lived until the plaintiff left the defendant, on October 11, 1923.

The other incident to which plaintiff's testimony relates involves a quarrel between the parties and an alleged assault on the plaintiff by the wife. Apparently plaintiff had placed some of his money in the possession of his father, and this was the provocation for the quarrel. Plaintiff testified:

"She demanded that money, or she would get the sheriff and have him come down there; and I told her to go on; and she began pulling my hair and slapping my face and kicking me. Her kicks were very severe, and she grabbed my hair in both of her hands and pulled it as hard as she could. She loosened my hair. I combed out nearly a handful; and she kicked me on the knees and the testicles. She had on shoes at that time. It made me sick. During this row, she had a clothes brush with a handle 12 or 13 inches long, and she hit me over the head with that before I got it away from her. When I was combing my hair the following morning after I left, I combed out a clot of blood from my hair."

This transaction is also emphatically denied by the defendant, who testified:

"There wasn't any quarreling or hair pulling. There was never any trouble at all, the day before he left. I never struck the plaintiff or pulled out his hair. I never took the butcher knife and tried to cut him. I never threatened to kill the plaintiff. I never threatened to cut him. I did none of these things he mentioned. The afternoon of the day before he left, he went down to his mother's and stayed there until about 4; and about 4:30 we ran the car awhile; and we went home and had supper; and he had to go back to work at 6:30."

It appears that no one except the parties was present during the second transaction; but it is shown that the defendant's mother and brother lived in the home, and were in the house during the time. The mother testified that there was no trouble of any kind between them on the day before he left. The brother testified that he was at home in the afternoon of October 10th, and observed no trouble between plaintiff and defendant. He was in a position to have heard "anything in the way of a

struggle. I did not hear any commotion that attracted my attention downstairs. I heard no loud talking or anything of that kind."

It does appear that a Mrs. Kingery claims to have overheard the quarreling between the parties to this suit on the day in question. Since this testimony is the only testimony that possesses a semblance of corroboration, we quote:

"I heard loud talking. I couldn't hear anything much that Mrs. Ludwig said, but I could hear her talking; but I heard what I stated from Mrs. Noel Perry, and I heard him say, 'I love my mother,' and she says, 'Well, I don't hate her,' and I heard him say, 'I can take my clothes and go,' and she says, 'You can't have your clothes,' and he says, 'Oh, yes, I will get my clothes.' Then I heard a noise,—sounded like they were pushing chairs around. I heard a part of the talk when they went upstairs. This talk seemed to be angry on her part."

On cross-examination, she said:

"He left that evening or the next day. This was in the afternoon. I didn't see him there the next morning. I am not friendly with Mrs. Ludwig [mother of defendant], and I don't care who knows it. * * * From what I heard afterwards, it must have been her struck him. Well, I heard the licks, and I heard him say, 'Talk away, Beula,—you can't hurt me.' That is what I heard. I was not watching and listening after that. I heard blows struck. I heard a slapping noise, like a woman would slap. You know about how a woman would strike, and I know, too."

It further appears that, on the evening of the alleged second quarrel, plaintiff had supper in his mother-in-law's home, went to his work as locomotive inspector, and on the next morning returned to the home, slept in his wife's bed until noon, and left without saying anything to anyone. The wife's brother had accompanied the plaintiff to his work on the evening before, and the latter made no complaint; nor was the matter, which must have been uppermost in his mind, discussed at all.

It is contended by appellee that corroboration is found in the testimony of his father, mother, and brother. The father testified:

"I recollect the time he separated from his wife. At that

time, he was sore and lame, and said he had been kicked on the knee; and inside here [illustrating] he was black and blue. He said his wife kicked him. I did not see her kick him,—all I know is what he told me."

Clearly, this testimony is hearsay. The mother testified as to her observations:

"I looked at my son's head. The roots of his hair were bloody. He told me he was so sick he could hardly work that night. I just saw his head. There was nothing done at that time about it."

This testimony may corroborate the condition of his head, but it is not corroboration of the essential fact that the defendant was responsible for the condition. The brother of the plaintiff gave similar testimony; but all he knew about it was what was told him by the plaintiff.

The testimony discloses that the defendant was possessed of a pleasant disposition. Friends of the family who were in a position to study and observe the relationship of this married couple testified that they had never witnessed any trouble, or heard the defendant talk in an angry manner towards the plaintiff. She has been willing at all times to live with the plaintiff, and states that she and her husband had always been affectionate. Further discussion of the facts is unnecessary. Plaintiff has failed to establish his case.

The granting of a divorce is not an administrative function, nor does it involve judicial discretion purely. We no longer recognize the old ground for divorce, as found in the Code of 1851, Section 1482, wherein it is provided that a decree may be entered "when it shall be made fully apparent that the parties cannot live in peace and happiness together and that their welfare requires a separation." We are constrained to believe, however, that these young people can live together in peace, and clearly their welfare does not require a separation.

"It is not the intent of our statute that a decree of divorce should be granted for the mere asking. Home ties should not be broken * * * for slight or transient reasons." *Hilliker v. Hilliker*, 196 Iowa 698.

"The marriage yoke cannot be thrown off merely because it rides unevenly." *Pfannebecker v. Pfannebecker*, 133 Iowa 425.

Courts must recognize that society has an interest in the permanency and stability of the marriage relation, and a severance of this relation must not be decreed except for just cause, within the definition of the statute. The evidence in the case at bar does not warrant a decree.

Wherefore, the judgment and decree entered is—*Reversed*.

FAVILLE, C. J., and ARTHUR and VERMILION, JJ., concur.