Minnie Agnew, Appellant, v. A. G. Agnew, Appellee.

No. 41583.

May 2, 1933.

Havner, Flick, Huebner & Powers and Paul James, for appellant.

McCoy & Beecher and Mears, Jensen & Gwynne, for appellee.

Donegan, J.—The plaintiff and defendant were married on the 31st day of December, 1929. At the time of their marriage, the de-

fendant was a widower 51 years of age, and the plaintiff, who had not previously been married, was 48 years of age. The defendant's former wife had died in 1926, and he had two sons, Grif and Jack, who were, respectively, 27 and 14 years of age at the time of the trial. Prior to her marriage the plaintiff had been the principal of a commercial school in the city of Des Moines. The defendant was engaged in the elevator business at Dunkerton in Black Hawk county, Iowa. Following their marriage they lived in the city of Waterloo until some time during the month of March, 1930, when they moved to Dunkerton. The defendant had purchased a home there in order that he might be near his elevator business, and they continued to live in this home until the 8th day of December, 1930, when the plaintiff returned to the home of her parents in Des Moines. Defendant's younger son, Jack, lived in the home with plaintiff and defendant from the time of their marriage until they separated, and his elder son, Grif, lived with them in Dunkerton from September until they separated in December. About a week after returning to Des Moines the plaintiff instituted an action against defendant in the district court of Polk county, Iowa. This action was later withdrawn, and on the 7th day of February, 1931, the plaintiff filed her petition in this case in the district court of Black Hawk county, Iowa. In her petition plaintiff asked for a separate maintenance on the ground that the defendant had been guilty of cruel and inhuman treatment endangering the health and life of plaintiff, that he had failed and neglected to support the plaintiff, and that he ordered the plaintiff to leave their home at Dunkerton, Iowa. It appears that no answer was filed to this petition until the case was reached for trial on the 26th day of August, 1931. On that day the plaintiff filed an amendment to her petition charging the defendant with adultery. To this petition and amendment the defendant filed an answer admitting the marriage, but denying all charges of cruel and inhuman treatment and of adultery. The case was tried and the testimony of a great many witnesses introduced on both sides. On the 26th day of December, 1931, the court entered a decree finding that the plaintiff was not entitled to the relief demanded by her, and dismissing her petition. From this decree the plaintiff appeals. In support of her appeal plaintiff-appellant claims that, under the evidence introduced, she was entitled to a decree of separate maintenance on both the ground of cruel and inhuman treatment and the ground of adultery. We will consider the two grounds upon which plaintiff

claims she is entitled to the relief asked in the order as set out by her.

I. In support of her claim that the defendant was guilty of cruel and inhuman treatment endangering her life, the appellant introduced evidence tending to show that the appellee spent some of his evenings away from home while they lived in Waterloo; that he failed to bring the plaintiff from Dunkerton to Waterloo for chiropractic treatments; that he made numerous trips to Waterloo and was out late at night; that he neglected to take the plaintiff to places of amusement or to provide her with entertainment; that he would not talk to plaintiff socially and would answer in a sullen, cross manner; that he was guilty of various acts of incivility such as leaving plaintiff and some company at the luncheon table and going with another man to Waterloo, refusing to help appellant wash dishes, refusing to allow appellant to drive his automobile, and going on fishing trips without inviting the appellant to go along; and, finally, that he ordered the appellant to leave his home on the day that the parties finally separated.

In regard to the appellee's absence from home in the evening while living in Waterloo, appellant testified: "He was out a good many evenings. I never recall he was out later than 11 o'clock. He would say some man had been at the elevator but he couldn't go into details. He was going to meet him down town in the evening and go over the matter." In answer to these charges the appellee testified that his absence from home in the evenings was due to the fact that he was operating an elevator at Dunkerton and was installing some new grinding machinery which took him away from home during some of the evenings. In connection with her complaint that appellee failed to take her to Waterloo for chiropractic treatments, she testified: "I had neuritis during a portion of the time that I lived in Dunkerton that I was hardly able to cut bread with my right hand. I came to Waterloo and took some electric and chiropractic treatments from Dr. R. D. Thompson. He said my husband ought to bring me in twice a week for treatment. I told him (appellee) about this neuritis and that I had a very bad cold, but he made no reply. He made no provision for my being brought over, nor did he make any excuse for not doing so. I came with my neighbors. My physician said that I did not come often enough to get results. I transmitted this information to my husband, but he said nothing, and he made no provision for me." The appellee meets this with a denial of the charges and says that he never knew that

his wife was taking medical treatments while they lived at Dunkerton; that she never informed him of the treatments taken from Dr. Thompson and never asked him for money to pay doctor bills. To appellant's charge that appellee did not take her to places of amusement or to Waterloo when he went there, appellee responded by denying the appellant's charges and stating that there was hardly a Sunday but what they were some place until he got sick; that he went to church nearly every Sunday; that he visited her relatives with her; that after they moved to Dunkerton he came to Waterloo about twice a week to visit his doctor; and that she came with him most of the time. The charge that the appellee made numerous trips to Waterloo and was out late at night was met by the appellee by stating that he was under treatment by Dr. Butts, that he had about two treatments a week on Wednesday and Saturday, that he came at nights because he looked after the elevator during the daytime, and that he usually got there about 8 o'clock because the doctor did not get to his office until that time. Appellant herself testified that on an occasion when he was out late and claimed to have been attending a Masonic meeting, she talked to her husband about going over to Waterloo and about the lateness of the hours he was keeping, and he said that he had been to a Masonic lodge and that by the time he got refreshments and got out to Dunkerton it was pretty late. She also said that on the occasion of an American Legion convention at Dunkerton, when he was out until about 11 to 12 o'clock, and she was alone and had to hunt up company among strangers, before he went back downtown he agreed to meet one Elmer Gallup, and appellee testified that he had a transaction which he closed up with Mr. Gallup that night and that he got home at 11 o'clock. As to the appellant's charge that the appellee did not talk to her socially and when spoken to by her answered in a sullen manner, we have searched the record and do not find that the appellee was questioned in regard to this matter either on direct or cross examination. However, appellee's son Grif Agnew stated that he never saw any trouble between his father and Mrs. Agnew during the period that he lived in the home, and never heard his father speak harshly to her.

With the single exception above referred to, practically every one of the charges made by plaintiff, which we have thus far considered, was either denied or explained by the appellee. All of the testimony of the appellant, in regard to these matters which we have thus far considered, was without corroboration. On the other hand,

the testimony of the appellee as to his visits to his doctor at Waterloo were corroborated by Dr. Butts. It is quite apparent, moreover, that none of the above matters of complaint made by the appellant was considered by her as of a very serious nature. In her testimony she says that she was not suspicious of the appellee until about November 5th, when she started to keep track of how late he was out by marking it down in a book; she says, "My purpose in marking it down in the book was I just thought I would have a little talk with him about this one of these days about what he meant by all this and he would not know whether he had been out or not. My thought was not to ask for a divorce or separate maintenance but I was just going to call his attention to it and ask him if that was the way to fulfill the promise he had made me. I had no thought of separation at that time. In fact I did not until the day I left and what happened prior was not the cause of my leaving." Moreover, it is quite doubtful whether any of these matters already referred to, or all of them in combination, would be sufficient to constitute cruel and inhuman treatment, and it is quite obvious that they would not meet the requirement of the statute that cruel and inhuman treatment, in order to constitute a ground for divorce or separate maintenance, must be such as to endanger life.

The most serious charge made by the plaintiff, in support of her ground of cruel and inhuman treatment, is that on the occasion of their separation the appellee compelled her to leave the home. Her version of what occurred on this occasion is as follows:

"The last Sunday I was in Dunkerton I was sick in the morning, but I went to Sunday School and came home and prepared dinner, but couldn't eat anything for I had a sick headache. I was on the day bed until about six o'clock. Mr. Agnew was there all afternoon but he did not speak to me. He got supper when the little boy came in and asked for something to eat, and after they started to eating he called out and said, 'Supper is ready,' and I said I couldn't eat anything. I went to bed about nine or ten o'clock. He did not ask me about my headache. The next morning he did not speak and that evening he told me about leaving.

"Q. Tell the Court about the matter of that conversation, what it was he said to you at that time? A. Well, this Monday evening I had—I was sitting at the table finishing the weekly patching, and he retired, I think about nine o'clock, maybe a little before.

While I was still doing this patching Griffith came in, he sat down and talked with me about some argument he had about boy scout work up town, we chatted and laughed there a little bit, and I finished up my work and retired also. Mr. Agnew asked me when I came in if Griffith was in the sitting room, I said he was when I came in, and in a little while, oh perhaps ten minutes, I heard Griffith come in the bath room and start up stairs, then Mr. Agnew got up and went in the bath room and looked out in the sitting room, and came back to bed, and he then said to me, 'Well, Minnie, you and I are not the two to be married, and the quicker you get out of here the better off we will both be'. I said, 'Well, I have known for some time that things weren't just right here, but I didn't know what was the matter', I said to him I thought the principal thing here was to get along with Jack and I have done that, and I called his attention to work I had done about the house, work I never had done, like putting on screens and cleaning basements and things like that. He said he hadn't any fault to find with the way I had gotten along with Jack, and had no fault to find with the housekeeping but he had this feeling against me and I asked him if he could tell me what I had done that made him feel this way, he said he didn't know, it hadn't all come on at once, but he said he had no fault to find with the way I kept up the work, and he went on talking, wanted to know if I could get out of there by noon the next day. I said I would go now if I could, but I have a lot of furniture here, the dining room furniture I bought and paid for, besides a lot of personal articles of my own, and he said he would see if he could get a truck to send it by noon and he would pay me for my furniture, and we went ahead talking about that, and so when morning came I got up then and dressed.

"Q. And what time was it when you got up and dressed? A. It was between twelve thirty and one o'clock and commenced to pick up books and personal things that I had there, then when daylight came I went to Mrs. Perry to get her to help me pack."

The appellee's version is as follows: "She had a sick headache on Sunday before she left and was on the day bed all afternoon and I stayed in the room and read. I never left the room and when supper time came I went out and got something to eat and asked her to eat. She said she wasn't feeling well enough, that she was too sick and did not want anything. So the boys came out and we

ate. She went to bed while we were eating and we did up the dishes and put the stuff away, and about nine o'clock I went to bed. I asked her how she was feeling and she did not answer. She was asleep. The next morning when I got up I asked her how she was feeling and she said her head did not ache but she felt dizzy. That was on Monday morning. We had our breakfast and I went to the elevator and was home for dinner. I came home that evening and went to bed early. I wasn't well. I went to bed possibly about eight o'clock. A little later I heard Grif come in and I heard them talking out in the room. Soon Grif went up to bed and then Minnie came in. She got in bed and started in saying 'I don't like the way you acted Sunday.' I said 'what did I do.' She said, 'when you were sick I did everything for you. When I was sick you didn't do anything for me.' I said 'there wasn't much I could do for you. I got supper.' She said 'besides you let Jack and the boys run through the room and make all kinds of noise.' I said 'I didn't know they was making noise, why didn't you say something about it and I would have stopped them.' She said, 'Well, if you wanted to stop them you could without me saying so.' She said that while her folks were up last fall that Dr. Buckmaster and I went away to a ball game and I never asked to be excused, and I said, 'No, I guess I didn't probably.' She said 'besides you went fishing several nights until nine or ten o'clock.' I said 'you never said anything about it at the time, why didn't you say so if you didn't want me to go fishing.' She said, 'Well, you know very well I didn't want you to go.' She says 'Every time I went to Des Moines I hated to come back.' I says 'Why?' She says, 'I never felt like I was one of the family, that is the reason I never brought my furniture from Des Moines up here.' She said she was going out in the room to get warm. She went to the room and in about half an hour I went out and said 'You better come back here, you will catch cold,' and she said 'No, I am going to stay here, I am cold.' I thought she meant it and went back to bed. I stayed all night and she did not come in until the next morning about six o'clock and she said 'I suppose you had a nice night's sleep.' I did not answer. I thought she might go on and get breakfast and forget about it but instead of that she put on her coat and hat and I said, 'where are you going?' She said 'I am going to get Mrs. Perry to help me pack up my things.' I got up and started breakfast and called Grif and told him what happened and we ate our breakfast. She said to me, 'can you get a

truck to take my stuff to Des Moines today?' I said 'Minnie, you better wait a few days, you might change your mind,' and she said 'No, sir, I am going and going today.' She then asked Grif if he would get a truck and he said he would. She said the dining room stuff I could use. I said, "I suppose if you are bound to go I will have to have one, so I will give you a check for it.' I told her I would also like the drapes but she said she was going to take them with her. I told her I would give her a check for the dining room suit but she told me if I did I would probably stop payment on the check. I told her that I had never done anything like that. She told me she would rather have the money so as soon as the Bank opened I got it and gave the money to her, amounting to $139.50. I counted it out and she said there was a mistake, it was $140.50, so I reached into my pocket and handed her a dollar. She said 'you people have to get dinner downtown, I won't have time.' She asked me what I was going to tell my sister Lela. I told her I was going to tell just what happened. She went into the bed room and I went to the elevator, and that was the last I saw of her until the day of the trial."

Grif Agnew was a witness as to some of the things that happened on the Sunday before and on the morning of the day appellant left Dunkerton, and said:

"I was there Sunday before she went away. She was lying on the day bed in the dining room that Sunday. Father prepared the meals. I do not remember that she ate dinner or supper. Father prepared supper. He got the supper ready. He called Jack and I to come and eat. He asked Mrs. Agnew if she would come for some tea. She said she did not want any and that she was going to bed. I discovered nothing unusual from that time until she left.

"Q. Will you state to the Court the circumstances under which she left that morning?   A. Father called me in the morning to come to breakfast, I got up and came down stairs and he told me that—"

We object to any conversation with any person unless the plaintiff herself was present at the time, being hearsay and incompetent.

"A. Well, he told me that she got mad and was going home, she had gone down to Mrs. Perry's to have her come and help pack their things."

Move to strike the answer as incompetent and self serving declarations on the part of the defendant.

"We ate our breakfast and were just ready to leave for the elevator when Mrs. Agnew came in. She asked father if he had gotten her a truck to take her things back and he told her she ought to wait a few days and think it over, that she might change her mind and not leave. She said she was going that morning and she turned around and asked me if I would get her a truck. I told her I thought I could get her one and she said all right. She turned around and told my father she did not want the dining room set and curtains and wanted to know if he would pay her for them and he said he would give her a check, and she said if you do I suppose you will stop payment on the check, and he said he never had done anything like that, and he said he would give her the money. He was up at the elevator when the Bank opened and went down and got the money and took it to the house."

The appellee's version of this affair is corroborated by his son Grif Agnew, while the appellant's version is not corroborated by any witness to the actual occurrence. Appellant has introduced, in support of her version of the matter, the testimony of witnesses to the effect that prior to this occasion she had made arrangements to take part in some holiday activities, that on the morning of the separation she went to the homes of the witnesses and told them that she could not take part in these activities, and told them of what had happened, and that she was crying and appeared to be nervous and excited at the time. It is quite apparent, however, that the circumstances of the appellant's suddenly canceling her arrangements to take part in the holiday activities and the fact of her crying and her apparently nervous condition are not sufficient to constitute corroboration of her testimony concerning what occurred between her and the appellee. In the case of Perry v. Perry, 199 Iowa 685, 202 N. W. 572, 573, in which the plaintiff, who was the husband, claimed to have been assaulted by his wife, the plaintiff testified as to the details of the alleged assault and his father testified as to seeing blood on the son's head which the son claimed was caused by the assault. In discussing this testimony of the father we said:

"This testimony may corroborate the condition of his head, but it is not corroboration of the essential fact that the defendant was responsible for the condition."

See, also, Hummel v. Hummel, 200 Iowa 1176, 206 N. W. 115.

The testimony shows quite conclusively that there was no serious disagreement of any kind between these parties up to the night before they finally separated. Aside from the charge that appellee ordered her to leave the home, the things of which appellant complains prior to the occurrence immediately preceding the separation are matters which she herself apparently did not consider seriously and which, if true, would not be sufficient to establish cruel and inhuman treatment. It appears without dispute that the appellee gave her a check book on his checking account at the bank and that neither he nor the bank ever placed any limitation on the amount or purposes for which checks might be drawn by her. It appears, moreover, that within a few days after going to the home of her parents in Des Moines, the appellant instituted an action against the appellee in the district court of Polk county, and that appellee, with his attorney, went to Des Moines and consulted her attorney in regard to appellant returning to the home of appellee. In her testimony concerning this she said: "I never offered to go back after leaving, as I never had any word from Mr. Agnew. Mr. James called me at one time and said that Mr. Agnew and yourself were in the city and he said that Mr. Agnew said if I wanted to come back all right, and I said to Mr. James what is the proposition and he said none at all, he wouldn't make any promise. I expected him to promise to be home in the evenings. I did not submit any terms as to the basis on which I would return. If Mr. Agnew had been willing to talk things over with me and had promised to treat me decently I might have come back. I made no attempt to have a conference with him because I thought after he had driven me out he certainly did not want me there."

The promptness with which the appellant left the home in Dunkerton following their conversation just prior to her departure, and her apparent indifference to a possible reconciliation, arouse at least a suspicion that appellant was not reluctant to leave the appellee's home and was not anxious to return. The physical ills and nervousness of which she complains are far from being necessarily connected with any misconduct on appellee's part, even if such misconduct were established. The evidence shows quite clearly that the appellant had suffered from neuritis prior to her marriage, and that during much, if not all, of her married life, she was taking treatments for her physical ills. Moreover, although it is denied by

her, it seems quite possible, if not even probable, that the bodily ills and nervousness from which she was suffering may have been due to a physical condition quite common to women at her time of life. Instead of being the effect of any cruel and inhuman treatment on the part of appellee, it is quite possible that appellant's nervousness and physical condition may have been the cause of her readiness to discover a grievance and leave the appellee's home. In view of the trivial nature of many of the things of which appellant complained, and the utter lack of corroboration as to any act of cruel and inhuman treatment committed by the appellee, we are unable to see how the appellant has established her right to separate maintenance on the ground of cruel and inhuman treatment on the part of appellee such as to endanger her life.

II. The charge of adultery brought by the appellant in her amendment to her petition is based upon illicit relations which she claims the appellee had with one Mrs. Champlin. These illicit relations are claimed to have occurred during the months of May to August, inclusive, 1931. The acts of adultery of which appellant complains are alleged to have occurred at the Agnew home in Dunkerton and at the apartment of Mrs. Champlin in Waverly. The evidence upon which the alleged illicit relations between appellee and Mrs. Champlin at Dunkerton are based consisted of the testimony of neighbors as to the visits of some woman to the Agnew home during the month of May, 1931. There were eight such witnesses, who were all members of families living in the immediate vicinity of the Agnew home. Of these eight witnesses not one of them positively recognized Mrs. Champlin as the woman whom they claim to have seen visit the Agnew home. Some of these witnesses were unable to give any opinion as to the identity of the woman who visited the Agnew home, and some testified that she appeared to be of the same height and build as Mrs. Champlin. Only two of them would go so far as to say that in their opinion the woman who visited the Agnew home was Mrs. Champlin, but neither of them would go so far as to make a positive identification. These visits to the Agnew home are alleged to have occurred approximately every other evening during a period of from two weeks to about a month. All of the witnesses admit that there was nothing secret about these visits, and no apparent attempt at concealment. Many of these witnesses refer to the fact that Mr. Agnew had been sick and was supposed to be sick at this time. One of these witnesses had heard a

telephone conversation earlier in the day in regard to some woman coming to visit the Agnew home that evening, and he testified that out of curiosity he watched to see if the engagement was fulfilled, and that the woman arrived promptly at the hour arranged, which he thinks was a quarter to 7 or 7 o'clock in the evening. He had told his wife about this telephone conversation and she was also with him when the woman visitor arrived at the Agnew home. Neither the testimony of these witnesses, nor the testimony of any of the witnesses, indicates that there was any thought on their part that any improper relations were being sustained by the appellee and the woman who called upon him. The arrival of the visitor was placed by these witnesses anywhere from 6:30 to 7:30 in the evening, which, during the month of May, would be in broad daylight. The car in which the visitor arrived was stopped in front of the Agnew home, and the visitor, as some of the witnesses expressed it, "tripped up the sidewalk" to the front porch. Sometimes Mr. Agnew and his visitor sat on the front porch, sometimes they went into the house, and sometimes they were in the yard. While some of these witnesses claim that Grif Agnew went up town or was away from the home on the occasion of these visits, others admit that he was present at least during a part of the visits. None of these witnesses testified to these visits continuing later than about 9:30. The time and circumstances of these visits would themselves tend to indicate that, instead of their being anything wrong connected with them, they were entirely innocent. If there had been anything suspicious about these visits, it is not only possible, but quite probable, that the curiosity of these neighboring witnesses would have been sufficiently aroused that they would have been able to positively identify her. Even the witness and his wife, who watched for the visitor after having heard the telephone conversation fixing the time of her arrival, were not sufficiently interested to be able to identify her, and, so far as the record shows, these visits or anything connected with them did not so much as furnish a topic for the neighborhood gossip of this little town.

The evidence as to what occurred at Waverly is to the effect that from some time after the first week of June, until about the middle of August, the appellee spent much of his time in an apartment occupied by Mrs. Champlin in Waverly. There is evidence that the plaintiff rented a room in Waverly, which was not in the same house as Mrs. Champlin's apartment; that in mornings he

would go to the apartment of Mrs. Champlin, take her back and forth to work, and remain there most of the day and until 9, 10:30, or 11:00 o'clock at night; that Mrs. Champlin was working in the daytime; that during the time Mrs. Champlin was at work he would sometimes sit on the porch and sometimes in her apartment; that he brought bundles to the house which were supposed to be eatables, and assisted Mrs. Champlin in washing the dishes; that during the time that he was spending his days and evenings in Mrs. Champlin's apartment, a fourteen-year-old daughter of Mrs. Champlin was there two or three times and remained a couple of weeks at a time; and that the appellee's son Jack was also there during a part of the time. The lady from whom Mrs. Champlin's apartment was rented testified that the period during which he came to this apartment was from about the first of June until the middle of August; that she understood he was ill and was supposed to be resting; and that he would be gone on different occasions two or three days at a time. The lady from whom the appellee rented his room testified that the appellee took this room about the second week in June, and that he went home on Fridays and Saturdays.

The appellee admitted his presence at Mrs. Champlin's apartment in Waverly. He and his son Grif both explained his presence there by saying that he was sick and was unable to work; that he needed certain kinds of food; that they were not able to properly cook this food at their home in Dunkerton; that Mrs. Champlin was a friend of Grif Agnew and had volunteered to cook for appellee in her apartment if he would take a room in Waverly.

Both appellee and his son Grif positively deny that Mrs. Champlin ever visited the Agnew home in Dunkerton, and say that the woman who was seen visiting the home was a lady friend of Grif's. The fact that the appellee had suffered a stroke and was in poor health during all this time from April to August is not only testified to by the appellee and his son, but is corroborated by Dr. Butts, a reputable physician of Waterloo, and is also corroborated to a considerable extent by the testimony of the witnesses for the appellant. The time spent by appellee in Mrs. Champlin's apartment in Waverly and his conduct while there were open and without any apparent attempt at concealment. The witnesses at Waverly, like those at Dunkerton, did not testify to any particular circumstance which aroused their suspicions that there was any wrongful relation between the appellee and Mrs. Champlin. The appellant's

action was pending during all this time and the trial began on the 26th day of August, and, if the relations between appellee and Mrs. Champlin had been wrongful, it seems quite reasonable to conclude that they would at least have made some effort to keep their associations secret.

It is well established by the decisions of this court that the mere opportunity to commit adultery will not justify the inference of guilt. In Anderson v. Anderson, 197 Iowa 383, 197 N. W. 300, 302, where a wife had left her husband and gone to keep house for another man, we said:

"BeDillion is a widower 53 years of age, with no children living with him. He has worked as a railroad brakeman, has been on the police force, and of late years has been employed as a laborer. He is not shown to have any property or means of livelihood except his labor. It doubtless is unusual for a man in his situation to maintain a home and hire a housekeeper, and yet the admitted fact that defendant was living in his house in that capacity under all the circumstances disclosed is neither so contrary to human experience nor so inconsistent with innocence as to sustain a finding that their relations were adulterous. The mere fact of her living there in that capactiy does not establish her guilt. It is a situation which, as has been said, society condemns, and one likely to provoke criticism. Fisher v. Fisher (Iowa) 182 N. W. 803. But without more it is not sufficient to establish adultery. Mere opportunity, without evidence of the will or disposition to take advantage of it, will not justify the inference of guilt."

See also, Aitchison v. Aitchison, 99 Iowa 93, 68 N. W. 573; Wells v. Wells, 116 Iowa 59, 89 N. W. 98; Inskeep v. Inskeep, 5 Iowa 204.

In our opinion the evidence in this case is insufficient to establish the ground of adultery alleged in plaintiff's amendment to her petition.—Affirmed.

KINDIG, C. J., and EVANS, STEVENS, ALBERT, and CLAUSSEN, JJ., concur.