MAY BLAIR v. WILLIAM BLAIR, Appellant.

**Divorce:** CRUEL AND INHUMAN TREATMENT. Plaintiff in divorce, an ordinarily strong and healthy woman, had lived with a married man as his wife before defendant married her. Frequent quarrels arose, for which both were at fault. The wife, though kind at times, was of hasty and violent temper, which caused her to use profane and abusive language towards her husband, and threaten and attempt bodily injury on him. At various times she took an ax, and threatened to break his head; threw a pan of lye water in his face, injuring his eyes; threatened to let his brains out with a smoothing iron; threw the lid of a butter dish at him; jumped for the butcher knife and threatened to cut his liver out, and used obscene language; threatened to open his head with a chair; and struck him with a buggy whip. The husband frequently came home under the influence of liquor, but only twice drunk. He did not use vulgar or profane language or seek the company of immoral women, but spent his evenings at home. When he had been drinking he was arrogant and boastful of his wealth, and was at times coarse in his language and provoking in his manner towards his wife. He spoke in coarse terms, to his brother-in-law, of her physical condition, secured a statement of a boy in his employ that she had hugged and kissed him, endeavored to induce him to be caught in an act of illicit intercourse with her, and made public on the trial her immoral conduct before marriage, which he had forgiven. On occasions he insinuated that she was too free with other men, and he used threats and violent language, but never attempted bodily harm, and the wife had no reason to fear personal violence. She was a strong and healthy woman, in as good health on separation as when she was married. *Held*, the husband's treatment was not such as to endanger the wife's life, and she was not entitled to a divorce on the ground of cruel and inhuman treatment.

*Appeal from Webster District Court.*—HON. B. P. BIRDSALL, Judge.

TUESDAY, OCTOBER 11, 1898.

ACTION for divorce and alimony upon the ground of "such cruel and inhuman conduct as to endanger the life of the plaintiff." Habitual drunkenness was also charged, but this charge was abandoned on the trial as a cause for divorce. Decree was rendered granting a divorce, and allowing the plaintiff three thousand dollars alimony. Defendant appeals. —*Reversed.*

*J. A. O. Yeoman* for appellant.

*Botsford, Healy & Healy* for appellee.

GIVEN, J.—I. Counsel cite may of the cases based upon cruel and inhuman treatment endangering life as a cause for divorce. We need not refer to them specifically, as the law is well settled that the divorce will only be granted on statutory grounds; that treatment as a cause must not only be cruel and inhuman, but also such as to endanger life. Whether a particular act or course of mistreatment is cruel and inhuman, and, if so, whether it is such as to endanger life, must be determined from the facts of each case. It may be said that vile, profane, or abusive language, threats or attempts of personal injury, and false accusations of infidelity from husband to wife or wife to husband, are acts of cruel or inhuman treatment, because of their relation and of the duties that each owes to the other. Whether such treatment endangers the life of the one so treated must be determined from the attending circumstances, such as temperment, disposition, and mental and physical condition of the one mistreated. Cruel and inhuman treatment towards one who was mentally or physically infirm might endanger life, when as to one who was in mental and physical health and vigor it would not have such an effect. As supporting these views, see footnotes to section 3174 of the Code, under "Inhuman Treatment."

II. These parties were married in December, 1888, the plaintiff then being twenty-three years of age, and the

defendant fifty-three. Plaintiff, though in fact an unmarried woman, was known as Mrs. Marks, having previously lived with a married man of that name in Illinois as his wife. A former marriage of defendant had been dissolved by decree of divorce, and his divorced wife was then deceased. After a few months' acquaintance and a brief courtship, the defendant proposed marriage, whereupon the plaintiff informed him of her former relations with Marks, and referred him to her mother for facts. There is a dispute as to whether the defendant was informed that Marks was a married man, but, be this as it may, it could have had but little influence in bringing the defendant to the conclusion which he reached. With full information that plaintiff had previously sustained illicit relations with Marks, the defendant agreed to marry her, and that the fact of that relation should be buried and never referred to during their married life. Though it does not appear to have been referred to but once, his knowledge of the fact explains, in part, at least, the dissensions that soon followed their marriage. After their marriage, the plaintiff went to live with defendant at his home, on his farm, where he was largely engaged in farming and buying and selling stock. His business required him to keep hired help on the farm and in the house, and to be from home most of the time during the day. So far as appears, defendant provided well for his houshold, and the plaintiff was industrious and attentive to her household duties, and, in the absence of hired help, milked the cows and fed the calves. Plaintiff now makes complaint that she was required to do that kind of work; but it can be said to her credit that she did not seriously complain of it at the time, and that it was not the cause of the estrangement that arose between her and her husband. In 1892 they moved to the city of Fort Dodge, where they resided until their final separation, in August, 1895. Soon after their marriage, dissensions and disgraceful quarrels began, which grew in frequency and violence up to the time of their final separation. We are not required to consider these numerous

quarrels in detail, nor determine which party is to blame, or most to blame, for any or all of them. It is sufficient to say that the evidence shows beyond dispute that both were grievously and inexcusably at fault.

If incompatibility were a ground for divorce, there could be no doubt of the propriety of separating these parties; but it is not a statutory ground for so doing, unless by reason of the circumstances it endangers life. The characters and dispositions of these parties, as shown in the evidence, may be briefly summed up: The plaintiff, though of kind disposition at times, especially to persons in sickness or distress, was possessed of a hasty and violent temper, which she did not try to control when angered at her husband. Her temper was so violent as to cause her, when angry, to use profane and abusive language towards her husband; and to threaten and attempt to inflict serious and bodily injury upon him. At one time, when quarreling, she took an ax, and threatened to break his head with it; and, when the defendant took the ax from her, she threw a pan of lye water, with which she had been washing milk cans, into his face, imperiling his eyes, and injuring them to some extent. On another occasion she threatened to let his brains out with a smoothing iron; on another, she threw the lid of a butter dish at him; and on another, jumped for the butcher knife, and threatened to cut his liver out, and to "gut the damned Swede bitch" (referring to their hired woman). On another occasion, she threatened to open the defendant's head with a chair, and on another struck him a number of times with a buggy whip, until he drove out of her reach. There was provocation for these attacks, but in no instance was the violence threatened or attempted necessary in her self-defense, or justified by the facts. The plaintiff either denies or gives explanations for these transactions; but, giving full credit to her denials and explanations, there can be no doubt that she exercises a violent and dangerous temper towards her husband, and sometimes on slight provocation. Her conduct may be accounted for to some extent by the fact

that early in their married life she became jealous of her husband,—a jealousy that continued up to their separation. Much evidence was taken with respect to the defendant's habit of drinking, and, while it shows that he was not an habitual drunkard, it does show that he drank intoxicants socially with others when about the towns where he went on business, and, no doubt, frequently came home more or less stimulated by the liquor he had drunk. It does not appear that he was ever what the witnesses call drunk but twice after his marriage with the plaintiff. According to the evidence, he was not in the habit of using either profane or vulgar language, nor in seeking the company of lewd women, and, as a rule, spent his evenings at home. He was somewhat arrogant and boastful of his wealth when he had been drinking, and, though not cruel in disposition, he was not always kind and considerate, but at times coarse in his language and provoking in his manner towards the plaintiff. Within a month or so after their marriage, he began to insinuate to plaintiff that she was too intimate with other men,—a jealousy prompted, no doubt, by his knowledge of her former relations with Marks. His jealousy grew, and found expression in his suspicions of a young lad of sixteen, who was employed to do chores about the house while the defendant was sick. Plaintiff testified to several instances of threatened and of actual violence, and of the use of profane and abusive language towards her; but in this she stands contradicted by the defendant, and unsupported by any other witnesses. The evidence other than that of the parties as to their conduct, up to the time they left the farm, is largely from those employed as help; and, while this evidence shows threats and acts of violence on the part of the plaintiff, it does not show that in any instance the defendant threatened or attempted bodily harm to the plaintiff. We discover nothing either in the disposition or acts of the defendant to warrant the belief that the plaintiff had any reason to, or did, apprehend personal violence at his hands.

Counsel for plaintiff insists in argument that it was cruel and inhuman for the defendant to call out on the trial, and to thus make public, the fact of plaintiff's former relations with Marks. Let this be conceded; yet, happening when it did, it was not a cause for plaintiff's abandoning her husband. It was no more cruel than for plaintiff to claim, on the trial, that an ailment with which the defendant was afflicted was a loathsome disease, resulting from association with lewd women,—a claim which the plaintiff utterly failed to establish. While it would have been inexcusable in defendant to have made public plaintiff's relation to Marks under other circumstances, it was not so on the trial, as it was an important fact in the case, accounting, as we view it, for the defendant's unreasonable jealousy. If the defendant was cruel in thus making public this fact, yet, made public when and as it was, it does not sustain the grounds alleged for divorce.

One Hislop, whose wife is a sister of the plaintiff, testified to a conversation with the defendant about a sickness that plaintiff had had, and about her not having any children. According to this witness, defendant spoke of his wife and her physical condition in coarse and unbecoming terms, and this is urged as cruel treatment. From what is testified to by a large number of reputable persons as to defendant's habit of using language, it seems improbable that he would have used the language attributed to him by Hislop; and yet, if he did, it was in a private conversation with his brother-in-law, with whom he might properly talk on the subject of his wife's health and physical condition.

In 1892 the defendant visited Scotland, where he and the plaintiff were both born, without asking her to accompany him, and left her only forty or fifty dollars in cash to use during his absence of three months. This is claimed to have been cruel. We believe the defendant when he says that he went to Scotland to get away from his wife for a time, in the hope that matters might be better when he returned, and that

it was for this reason that he did not ask her to go along. He brought her back some valuable presents, and they did live happily for a time after his return. In addition to the forty or fifty dollars cash, he left her his credit, which was good, upon which to buy what she needed; and it is not claimed that she lacked any needed comforts during his absence.

The most cruel and inhuman act of the defendant towards the plaintiff disclosed in this record was what he did and attempted with the sixteen-year-old boy shortly before their final separation. It is evident that the defendant had become so intensely jealous of the plaintiff by that time that he seized upon her every act of familiarity with others as confirmation of his jealous suspicions. The boy testifies, in effect, that defendant got him to sign a written statement that Mrs. Blair had hugged and kissed him, and that the defendant sought to engage the boy to get Mrs. Blair to go to the barn with him, so that the defendant might catch them in the act of illicit intercourse, and for this he would drop a sum of money where the boy could pick it up. Defendant denies that he so planned and promised, but admits that he was suspicious of the relations between the boy and his wife,—a suspicion for which he had no reasonable ground. In view of the defendant's intense jealousy, we are inclined to accept the statements of the boy as substantially true, and as disclosing most dastardly cruel and unreasonable conduct on the part of the defendant; but the question remains whether this, with his other acts, endangered the life of the plaintiff. So far as appears, plaintiff was an ordinarily strong and healthy woman, mentally and physically, and in the enjoyment of as good health at the time of the separation as at the marriage. There is certainly much to condemn in the conduct of both parties. Conceding that there is more than we have indicated upon the part of the defendant, yet, after a most careful consideration of the evidence, we are led to the conclusion that, however cruel and inhuman his treatment of the plaintiff was, it was not such as to have at any time endangered her life, nor

to endanger it if they were compelled to still live together. When not in anger, they were kindly disposed towards each other, as is shown in the care which each took of the other in sickness, and by the fact that, though the plaintiff left her husband four or five times, she each time returned to him voluntarily, at his request. If this man and woman would bury and forget their groundless jealousies, control their tempers, and practice forbearance, each with the other, there would be nothing to prevent them from living peacefully and happily together. As we view the case, the plaintiff failed to establish the causes for divorce stated in her petition, and therefore her petition should be dismissed.—REVERSED.