NELLIE A. COFFIN, Plaintiff and Appellant, v. L. S. COFFIN, Defendant and Appellee.

**Marriage and divorce:** SEPARATE MAINTENANCE: EVIDENCE. In this
1 action by the wife for separate maintenance the evidence is reviewed and held insufficient to show such inhuman treatment as to entitle plaintiff to a decree.

**Same:** DESERTION: EVIDENCE. The evidence is reviewed and held
2 sufficient to entitle the husband to a divorce on the ground of desertion.

*Appeal from Webster District Court.*—HON. CHAS. E. ALBROOK, Judge.

SATURDAY, JUNE 8, 1912.

THE plaintiff brought her action for separate maintenance. The defendant filed a cross-bill for divorce on the ground of desertion. There was a decree dismissing the plaintiff's petition and awarding the decree of divorce to the defendant. The plaintiff has appealed.—*Affirmed.*

*Healy & Healy* for appellant.

*Kelleher & O'Connor* for appellee.

EVANS, J.—The parties hereto were married on April 4, 1908. The plaintiff was forty-four years of age and the defendant eighty-five. Prior to the marriage the parties had been quite well acquainted for about fourteen years. Each party had been married twice. The plaintiff was the mother of two children as the fruit of her first marriage. In 1889 she obtained a divorce from her first husband on the ground of desertion. In 1893 she married one Dr.

Ingalls, who was then at the head of a charitable institution near Chicago, and with which the defendant was connected as president of its board. The plaintiff also occupied a somewhat responsible position in the management of such institution, acting as secretary thereof. She separated from Dr. Ingalls in 1898, securing a divorce from him in 1903. During her connection with such institution she had become acquainted with the defendant, and had frequently performed stenographic services for him; and such acquaintance continued down to the time of their marriage. The plaintiff's life had been one of industry and hardship. She had been practically self-supporting since her first marriage. The record discloses nothing discreditable to her in her past history. For some time before her marriage her home was with her married daughter in Detroit.

The defendant was a long-time resident of Webster county. He was a man of considerable reputation as a philanthropist. He had a farm of about seven hundred acres near the city of Ft. Dodge upon which he lived. His life had been one of great industry, and his habits were naturally economical. For many years he had interested himself in philanthropic enterprises to which he contributed liberally in time and money. Some of these enterprises were maintained upon his farm. He was a man of considerable wealth, the amount of which does not appear with exactness in the record. Sufficient does appear therein to indicate that it approximated $100,000. The extent of the defendant's estate was not lost sight of in the marriage negotiations. In this respect, however, both parties stand upon an equal footing. In the correspondence preceding the marriage the defendant had assured the plaintiff that her interest in his estate would be "not less than $25,000." He did, however, warn her repeatedly that she was running a great risk because he was burdened with the infirmities incident to his age. He

was very deaf. His eyes were afflicted, though his sight does not appear to have been greatly affected. In some respects he retained marvelous energy in both body and mind. He was a man of plans, and his will power appears to have been unabated. He managed his own property, even in small details, and retained his full dominion over his own. He had had sympathy for the plaintiff in her hardship for many years before the marriage and had lent her slight assistance. He regarded the plaintiff as a deserving woman of great ability. He was willing that she should receive a widow's share out of his estate. He also was expecting great assistance from her in his philanthropic enterprises, and especially in his correspondence in relation thereto. A perusal of the letters written by the plaintiff and appearing in this record indicates clearly that she is a person of marked mental ability, with a rare gift of observation and expression. These letters and her testimony indicate, also, that she is strong in her personality and individuality, and that she is not wanting in will power. The foregoing is perhaps a sufficient preliminary statement to serve as a background for the consideration of the direct issues in the case.

After the marriage, the parties occupied the defendant's home upon his farm, and so continued until August 9, 1909. On this date the plaintiff left the defendant, in company with her married daughter, who had been visiting with her for the preceding month, and returned to Detroit to the home of the daughter. Shortly afterwards and within three or four weeks, she began an action for separate maintenance, and obtained an order for temporary alimony. She alleged cruel and inhuman treatment as the ground for her action. Some months later, and in the year 1910, such action was dismissed by her counsel. The circumstances under which the dismissal was entered were such that no inference should be drawn therefrom unfavorable to the plaintiff. The dismissal was entered

by plaintiff's attorney in pursuance of a suggestion from the attorney for defendant, and upon assurance of his personal belief that, if the suit were dismissed, the defendant would contribute voluntarily to the plaintiff's support. These negotiations between the attorneys were *bona fide* efforts on their part to serve the interests of their respective clients, and to avoid the publicity and expense of a public trial, and no other significance should be attached thereto. After the dismissal, the defendant did contribute to the support of the plaintiff from $50 to $75 per month. This amount was less than had been provided in the order of the court for temporary alimony while the suit was pending, and was unsatisfactory to the plaintiff. Thereupon this action was brought in January, 1911. It was brought to trial on October 14, 1911. As grounds for her action, the plaintiff charged cruel and inhuman treatment endangering her life. In September, 1911, the defendant filed his cross-bill, asking for a divorce on the ground of willful desertion. Upon such petition and cross-bill the case was tried. Our first inquiry will be directed to the allegations of the petition and the evidence relating thereto.

I. The case involves no doubtful questions of law, and turns wholly upon questions of fact. The record is too voluminous for us to enter into a discussion of the evidence in its details. A large part of the evidence consists of letters between the parties and these cover one hundred pages of the printed record. It is impracticable, therefore, for us to do more than to announce our conclusions of fact in a very general way. The parties began housekeeping within a few days after the marriage. The plaintiff's first complaint in her evidence was directed to conditions confronting her in the home at the beginning of her married life in the spring of 1908. The following excerpt from her testimony is illustrative:

> After I had been at Mrs. Rutledge's, I talked with

I. MARRIAGE AND DIVORCE: separate maintenance: evidence.

Mr. Coffin about beginning housekeeping for ourselves. I said that I preferred to keep house for our little family. There were only three of us, and I preferred to do the work, the cooking, and the chamber work, and light housework, but not the washing. He said he didn't think there would be any trouble about the washing, that he had always managed that part, running the machine, and done most of the washing himself. When we began housekeeping, we bought no supplies. There were some things there. I asked Mr. Coffin what supplies he had to start housekeeping with, and he said that I would find a plentiful supply of everything in the pantry. I found about two hundred pounds of flour in the flour bin. It had been there a long time. It was full of old weevils and floor sweepings, newspapers, rat and mice excreta, bugs and worms and flies. I told Mr. Coffin that I thought it would be impossible for me to make bread or anything out of that. He said it was perfectly good; that Walter Payne had ground it, and he had looked it over at the time, and that it was perfectly good. He examined it in my presence. I cooked with it about two months, then we had a fresh supply shipped from Frank Payne's at Williams, Iowa. I washed on the board for a number of times. I think it was about two months from the time I came there. Then we bought a lever machine that worked with a handle. I told him I had never done family washing in my life, I had never used a washboard, and I would like to have an oscillating or handle machine. He said: 'I am afraid you are not a good judge of those machines. I don't know what to do about it. I am afraid you don't know what would be a good machine.' I said: 'Yes; I remember one that we had in the home, an oscillating machine that was very fine, and I would like one like it, but not so large.' He didn't approve of it at first. After we talked about it a great many times, he concluded to order one from Sears, Roebuck & Co., Chicago. It cost $3.21 plus the freight. About a month or six or seven weeks, perhaps, after our marriage, I had a conversation with Mr. Coffin in reference to the matter of soap. He had some soft soap in the cellar—black soft soap. It had a good deal of refuse in it. I told him I didn't quite like that soft soap; that I would prefer to use Ivory soap;

that I had always used that. He said that soft soap was perfectly good, that Mrs. Rutledge had used it in her very fine white clothes, and he thought that Mrs. Rutledge's clothes would warrant the use of it. I told him I didn't like it, it was very offensive and smelled badly. It was full of refuse and bugs and worms of every description. I didn't like to use it on my fine white clothes. He said that it was perfectly good, and to use it until it was gone. I used it right along. He fixed the soapsuds in the boiler, and used it as he had always done. I told him that I could do our washing for about four cents with one bar of Ivory soap, and I would prefer to use it. He said it wasn't necessary to have so many kinds of soap around. He didn't have any salt on hand in the house. He brought some in from the barn, and said I might use that. I told him that the salt was very coarse, that I wasn't expert cook enough to use that coarse salt. It was full of weevil, sheep wool, and excreta of different variety of bugs and worms, straw, and hay, sand and dust. I didn't rightly think it warranted being used. I told Mr. Coffin that we could buy salt in town for five cents for two pounds, and I would rather buy it. He said that the salt was perfectly good. I got other salt at that time.

She also testified to other humiliations which involved no personal hostility from the defendant toward her. She also testified to an altercation of words concerning a washing. All this testmony was either denied or explained by the defendant. Giving full credence to plaintiff's evidence, but with full allowance for descriptive power, it falls short of showing such conduct as would authorize a divorce or separate maintenance. She had unlimited credit at the stores, and could order anything she wanted, and did order what she wanted when she deemed it necessary. Further than this, it so happened that in July, 1908, she went upon a visit to the home of her daughter at Detroit. During her absence many letters passed between her and her husband. These letters were all appreciative and affectionate and creditable to both parties. They strongly corroborate the contention of the defendant that there had been no friction be-

tween them up to that time. We must hold, therefore, that the evidence fails to show any cruelty in a legal sense up to this point. The other alleged acts of cruelty to which the evidence was directed are said to have occurred in July and August, 1909. During this period the daughter of the plaintiff with her little babe was visiting with the plaintiff. The daughter was there for five weeks. From the time of the beginning of her visit the plaintiff intended to return home with her. Shortly before the expiration of the daughter's visit, three or four verbal altercations ensued within a short period. They related in the main to the use of a horse for driving, and to the harnessing and hitching of the same. They were all quickly repented of by the defendant with attempted apologies. These altercations were comparatively trivial. The plaintiff was quite as responsible for their arising as was the defendant. His sensibilities had been touched by conduct on her part that was calculated, if not intended, to that end. The result of each altercation was that the defendant yielded his will in the matter to hers, and she had her way; the defendant tendering both apology and assistance. We necessarily reach the conclusion, therefore, that statutory cruelty was not proved at this point. Her petition was therefore properly dismissed.

II. Was the defendant entitled to a divorce on the ground of desertion? Concededly the plaintiff left him on August 8, 1909, and he never saw her again until the time of the trial in October, 1911. If she was justified in leaving him, then she was not guilty of desertion. But our conclusion upon the first branch of the case is against the plaintiff upon this proposition. It follows, therefore, that her absenting herself from the defendant was "without reasonable cause." That the position of the plaintiff was a hard one is manifest, but it was a hardship foreseen and one from which the defendant was powerless to save her. The dis-

2. SAME: desertion: evidence.

.parity of age was all but appalling. The difference in ideas and tastes and habits of cleanliness was incidental to the disparity of age. The marriage ought never to have been contracted. But, having been contracted, it ought to have been performed. Like every marriage contract, it was "for better or worse." The promise of such a marriage was not rosy to begin with. But it did promise to the plaintiff a home of her own and a final financial reward sufficient to save her from dependence upon her relatives. She is not to be harshly judged because of these considerations. But the very conditions into which she voluntarily entered for these considerations can not be laid before us as grounds of relief from the burdens so undertaken. If the plaintiff was entitled to a separate maintenance, she was entitled to a divorce. She chose to ask for the former rather than the latter. This she was legally entitled to do. But the fact that she chose to ask for the former relief when she was entitled to neither is a circumstance against her as indicating that she desired to escape the burden of the marriage and yet cling to its financial reward.

It is urged by her counsel in her behalf that her departure on August 9, 1909, was intended to be only temporary, and that it was with the consent of the defendant. It is also urged that on the night of August 9, 1909, the defendant wrote a letter to. the plaintiff's son-in-law concerning her departure, and that this letter was exhibited to the plaintiff by the son-in-law. It is contended that the statements contained in this letter caused and justified the refusal of the plaintiff to return, and caused and justified her suit for separate maintenance thereafter brought. We have examined this letter with care, and we fail to find in it any reasonable cause or justification for such course. The plaintiff had not frankly confided to defendant her intention to abandon him. She went ostensibly for a visit and for the purpose of being present at her daughter's confinement in November. The defendant expostulated

with her for going for such purpose at that time. Her preparation for the trip was carried on clandestinely. She took with her everything that she had, including her winter furs, which the defendant had bought for her. She separated herself from the defendant so that he could not find her for many hours before her train time, which was 10 p. m. The circumstances of the day satisfied the defendant that she had abandoned him, and this was the substance of what he wrote to her son-in-law, with whom he appears to have been acquainted.

It is also urged that the voluntary contributions made by defendant to plaintiff's support were intended to deceive her and to lull her into security while defendant's cause of action for desertion was maturing by lapse of time. Neither is this position tenable. The voluntary contributions of the defendant were paradoxically involuntary in the sense that, if they were not made, he would be confronted with another suit for separate maintenance and temporary alimony. The plaintiff did in fact declare the contributions thus made to be insufficient for her support and the present suit was the result. While such voluntary contributions were being made by the defendant, he wrote to the plaintiff a number of conciliatory letters. No reply was made to any of these until in July, 1910. At that time plaintiff wrote an answering letter. The letter is before us, and evinces too plainly the clear intention of the plaintiff to separate herself from the defendant forever. The letter is lengthy and no useful purpose would be subserved by setting it forth herein. It is sufficient to say that the plaintiff's gift of language was used to its uttermost in setting forth the scorn and derision in which she held the defendant. It was withering and final. Its perusal leaves no room to believe that she could be lulled into security or wooed again by any advances of the defendant. Some later letters were kinder in tone, but no suggestion of a return is contained in any of them.

Upon the whole case, therefore, we reach the conclusion that the defendant was legally entitled to a divorce on the ground of desertion, and that the decree entered below was right in that respect.

A motion to strike appellee's abstract was submitted with the case. This motion must be overruled.

The decree entered below is *affirmed.*