ROSE CARLSON, Appellee, v. FRANK E. CARLSON, Appellant.

**DIVORCE:**  Cruelty—Evidence—Insufficiency.    Evidence held insufficient to establish a plea of cruel and inhuman treatment.

Headnote 1:  19 C. J. p. 142.

*Appeal from Woodbury District Court.*—ROBERT H. MUNGER, Judge.

APRIL 7, 1925.

ACTION for divorce.  Decree as prayed, with alimony.  Defendant appeals.—*Reversed.*

*T. F. Bevington* and *Naglestad, Pizey & Johnson,* for appellant.

*Henderson, Fribourg & Hatfield, A. R. Strong, Carlos W. Goltz,* and *R. J. Millard,* for appellee.

PER CURIAM.—This is an action for divorce.  The parties

were married March 9, 1894, and since that time resided upon a farm owned by appellant, until their separation shortly prior to the institution of this suit. Four children were born to them, all adults at the time of the trial, except Marie, who, at the time of the trial, was 13 years of age. Frances and Sylvia, daughters, are married, and reside in the vicinity of the home farm. The ground upon which a divorce is asked is cruel and inhuman treatment which endangered the life of appellee. The question of alimony entered largely into the controversy. Mrs. Dunnington (Frances) and Marie gave testimony favorable to their mother. Robert, a son, and Sylvia, on the other hand, corroborated the testimony of the father, which denied most of the charges of cruelty made against him. It is conceded that both were industrious and frugal, as was common with families in their situation when married, although at the time of the trial their net wealth did not exceed $5,000. Appellee complains because the parsimonious habits of appellant made it necessary for her to work very hard, both in and outside the home. The testimony disclosed that both have considerable temper, and that appellant is somewhat provincial in his social and religious views. Much of the trouble between them was caused by his efforts to prevent card playing in the home, and to keep the children from indulging in social recreation which he thought improper.

Appellant admits that, during the earlier period of his married life, he possessed a somewhat violent temper, which he did not control. Two or three episodes brought out in the testimony of appellee reveal her as a person of violent temper, and capable of taking care of herself. She testified that, upon one occasion, after appellant joined the church, he told her that he desired to confess that he had had improper relations with other women, both before and during the period of their married life, and that, during the conversation, which occurred at the dinner table, he accused her of having produced an abortion on herself; that, in response to this accusation, she picked up the butcher knife and threatened to cut out his heart; that he protected himself with a chair; that she was determined to carry out her threat unless he admitted that the accusation was false; and that he did so. Appellant's version of the conversation is

entirely different.  He denied, *in toto,* the alleged confession, but admitted that he asked her if she had anything to do with the miscarriage previously occurring, and that she made the threats as stated.

On another occasion, she chased Robert out of the house and away from the premises, as she claims with a curtain rod, but, as the preponderance of the evidence shows, with a poker. On the same occasion, she referred to her son-in-law, Sylvia's husband, who apparently took no part in the controversy, as follows:

"Q. .Well, you did call Bolte some name, didn't you? A. Oh, yes, I did say that I called him a name. Q. You did say you called him a name? A. Yes, I did call him a name. Q. What was it? A. Son-of-a-bitch. Q. Dirty Dutch son-of-a-bitch? A. No, sir, I called him a son-of-a-bitch; but I will have to take that back, because I don't think his mother is a bitch, but he is just a homemade one."

Appellee also testified that appellant often referred to her as indecent, and that upon one occasion he struck at her in the hall.  This episode is admitted in part by appellant, but he denied that he made any effort to strike her.  The charge of indecency was repeated by Frances and Marie, but it appears to have generally referred to conduct and games to which appellant objected.  Frances testified that her father had a bad temper, and that, when angry, he abused her mother, accusing her of immorality.  Robert and Sylvia testified that, on the contrary, he was usually kind to her, and that the faultfinding was as much on the part of one as the other.

It is charged that appellant struck Marie, when a child, with a pitchfork, because she had failed to perform a task confided to her.  The one side sought to magnify this incident, and the other to minimize it.  We are of the opinion that the chastisement by the father on this occasion went beyond proper limits. He later so regarded it, and testified that he never punished her again.  There were quarrels over furniture, stoves, and other matters, arising from time to time between them.  Appellee complains that her husband was parsimonious, and bought her but one suit during their married life.  She admitted, however, that she drew checks at the bank, and that but one check was returned

unpaid. She immediately drew a check upon another bank for the item, and it was promptly honored. Appellant appears to have proper affection for his children and interest in their welfare. He gave Robert $560, when he was 20 years of age, with which to purchase an automobile. He gave Frances over $1,000 when she was married, and Sylvia $560 in cash, a team, and a harness, which brought the amount up to approximately $1,000. Some of this money he borrowed. In so far as it is claimed that he accused appellee of immorality, he denied it; and nothing appears in the evidence to indicate the slightest ground for suspicion against her. Appellant purchased a piano for his daughters, and such as desired were given music lessons. He objected to their playing ragtime, particularly on Sunday. He belonged to a near-by church, and returned thanks at the table. Appellee testified that she frequently paid no attention to this, and proceeded at once with her meal. Appellee raised many chickens, helped milk the cows, and did much other farm work; and, for a time, drove the bus for the school district, for which she was paid $60 per month. This, so far as the evidence shows, was voluntary upon her part. Her hardships in this particular doubtless appear much larger in the retrospect than they did when she was willing and sought to aid the family to live and accumulate. She complained of being without money, and unable to purchase the reasonable necessities of life. It appears, however, that she loaned Frances's husband, shortly after their marriage, about $1,200, and that she destroyed the note that was given therefor. She loaned $50 to Sylvia, whose husband shortly thereafter paid it back. There were many fits of temper and quarrels over a variety of matters during the married career of the parties, but in none of them does appellee appear to have received the worst of it. The climax of their trouble came after appellant joined the church. He was apparently narrow in his views, and no doubt unreasonably restricted the social privileges of his children.

There is too much crimination and recrimination between the parties to justify a decree in appellee's favor. Both were to blame,—one as much, perhaps, as the other. Neither appears to have suffered any decline in health. Some years prior to their separation, they ceased to occupy a bed together. Appellant

testified that he left his wife's room, in which Marie also slept, because he thought his wife wanted him to do so; and that his wife, who desired to avoid pregnancy, rendered the sexual relation between them offensive to him.

We shall not go further into the testimony in detail. There is much more than we have stated. We have given it careful consideration; and are of the opinion that a little forbearance on the part of each would have avoided most of their difficulties. The farm on which they resided was, at the time of the trial, heavily incumbered; and while they had considerable personal property, appellant's unsecured indebtedness exceeded $10,000. Their total net wealth did not, perhaps, exceed $5,000.

It is our conclusion that the testimony as a whole does not sustain the charge of cruelty, as that term is defined by the statute relating to divorce. The decree below is, accordingly,— *Reversed.*