ELSA WEATHERILL, Appellee, v. AUGUST WEATHERILL, Appellant.

No. 46943.

DECEMBER 17, 1946.

REHEARING DENIED FEBRUARY 14, 1947.

Kimball, Peterson, Smith & Peterson, of Council Bluffs, for appellant.

John J. Hess, of Council Bluffs, for appellee.

BLISS, J.—The cruel and inhuman treatment, on the part of the defendant, which has undermined the health of the plaintiff and endangered her life, and will continue to do so unless she is granted a divorce, is thus alleged in her petition:

" * * * the defendant on many occasions in recent months has threatened the plaintiff with violence, has struck her repeatedly and has caused her to be sick and ill and by reason of his treatment of her she has been compelled to go to a hospital and employ a doctor to attend her ills and ailments, all of which are due to the treatment accorded her by the defendant."

She alleged the mistreatment has covered a period of about eight years but has been worse since about October 1, 1944. She prayed for alimony, temporary and permanent, suit money, attorney's fees, the custody of the two youngest children, and an injunction restraining defendant from disposing of his property and "from harassing or annoying the plaintiff or doing her personal violence of any kind." The petition was filed April 24, 1945. On the second day following, the injunction prayed for was served on defendant, and because thereof and the demand of plaintiff he left the home and thereafter lived elsewhere.

Defendant filed answer denying the allegations of the peti-

tion charging him with misconduct. He alleged that he and plaintiff had lived together happily for more than twenty-five years until recently when plaintiff without reason or cause became dissatisfied, which attitude he attributed largely to her period of life, and to improper influences outside of the family circle. He alleged that they owned a comfortably furnished home, free of encumbrance or debt, about $750 of government bonds, and about $100 in the bank.

By the decree the court granted plaintiff the home and all household furnishings, $500 of bonds, attorney's fees and costs, $100 a month until the fourteen-year-old daughter had finished high school or married, depending on which event occurred first, and $50 a month thereafter.

No questions of law are in controversy. The facts are decisive of the issues involved. We will refer to such evidence as will show the reasons for our decision. The trial was begun March 14, 1946.

Plaintiff is forty-six years old, and defendant is apparently about the same age. They intermarried November 26, 1919. Four children were born to them: the oldest, a girl of twenty-six years; a boy of twenty-five; Charles, nineteen; and Nadine, fourteen years old at the time of the trial. The elder daughter married March 28, 1943. Her husband was in the service and she came home August 5, 1945, and her baby was born November 4, 1945. Her husband came home from the service right after January 1, 1946. All were living in the home at the time of the trial. Plaintiff testified:

"They understand they can stay there as long as they want to, make it their home, just as they are. * * * they have access to the whole house, it is just as their home, that is all."

The elder son married about June 1942. When he went into the service he brought his wife and daughter to his parents' home and they stayed for some time. Charles, the younger boy, was graduated from high school in June 1945, and thereafter has been in the employ of the Burlington Railroad Company at $160 a month. He and Nadine have always lived at home and the latter, at the time of the trial, was attending Junior High School.

The defendant has been in the employ of the Chicago, Northwestern Railroad Company since 1920—first at Council Bluffs until about 1930, when he was transferred to Fulton, Illinois, then to Clinton, Iowa, and to Cedar Rapids, and in 1938 back to Council Bluffs, where they have since lived. He was apparently an efficient workman. His wages varied. For a time he was paid per month $179, then $205, $209, $220, and $235. When the divorce action was started he was assistant car foreman in the coach yard at Council Bluffs, and was receiving $271 a month, but, with income-tax and other deductions, his "take home" monthly pay varied from $202 to $207. Before .he was transferred to Fulton he bought a home in Council Bluffs, on contract, in 1924. He paid $1,200 down. He put a basement under the house, cemented it, installed a furnace, and put a new roof on it. He fully paid the balance of $2,800 owing on the contract in 1934, and because he had difficulty in keeping it rented, he sold it in 1936 for $2,750 on deferred payments. He paid a commission of $200. On November 20, 1939, for a consideration of $4,450, be bought his present home. From money which he had, and by cashing bonds which he had received as Federal Adjusted Compensation as a veteran in World War I, he paid $2,450 cash on the contract. The balance of $2,000 he paid largely by monthly installments of $25 and interest each month. The earlier payments, because of the larger interest increment, approximated about $40 a month. By cashing bonds to the amount of $600 he paid the balance of the purchase price in February 1945. It is a comfortable home, modern in every respect, with seven rooms. The. entire transaction had been handled through one Charles Thomas, a broker of some kind. The deed was to have been taken in the names of himself and wife. His wife had attended largely to the transaction. She had worked and spent much time for two years or more in the Thomas office but had little to show for it. When defendant saw the deed he noted that his name did not appear on it. He went at once to Thomas and explained to him that the title to the home was to have been in the names of him and his wife, and Thomas said: "Oh, we will make a quitclaim deed."

When defendant was making out their joint income-tax reports for 1943 he asked plaintiff the amount of her earnings. She told him she had earned nothing. He told her he could not understand that. She gave him no satisfactory explanation. She gave him a similar answer when he made out the 1944 income-tax report, although she was at the Thomas office or riding about with him almost every day throughout the year, and having some dealings with an old gentleman named Mc-Carthy. During a large part of 1944, the defendant was working nights. He would come home about 8:30 a.m. and get a bite to eat—and that is plaintiff's testimony—and go to bed. He testified that many nights she had not come home when he went to work in the evening. He protested against her working and her absence from the home, when there was no necessity for it, and told her she should attend to her household duties and look after the little girl.

Plaintiff testified that prior to 1944 she had been employed by an advertising agency and had done work in her home for it for three years. Defendant testified that she had never revealed this to him. Concerning the McCarthy transaction, defendant testified:

"I learned she was being employed outside of the home. It was when this McCarthy case came into the picture, when she took over the McCarthy property and submitted to it being deeded to her, that was in the early summer of forty-three. She didn't consult me whether I thought it was all right or not, she went ahead and permitted her name to go on the papers, and after it had been all recorded in the records she told me about it one night. Well, I didn't like the idea and I told her, I says, you are taking over nothing but grief and I didn't want a thing to do with it. I didn't want any part of it. That is when the trouble started in our home."

He testified that his wife informed him about Mr. Thomas continually asking her to come down and work in his office, and that he made her an offer of five dollars a week, and later that he would pay her fifty cents an hour:

"Then when she got into this property deal, then she started at this book work for him spasmodically, and the first.

thing I knew, why she was down there two or three days a week, and she would make her trip down to McCarthy's and that would be once a week, twice sometimes, then she would be at the office. Well, forty-three rolled around, and forty-four continued, and in forty-four she was in his office * * * most of the time. * * * With reference to the McCarthy deal, all I said was that I thought I should have been consulted before anybody to such a deal would get her to sign any papers. What I meant was that she should have sought my counsel or advice before getting into such a mess. There was litigation arose out of it on account of McCarthy wanting to have the deed back. About the McCarthy deal I told her there would be nothing but grief for her—she had right there stepped into a boiling pot. They finally had to come to me to get my signature on it before they could transfer the property. There was argument over the McCarthy deal.''

It appears that Mr. and Mrs. McCarthy and the Weatherills had been acquainted for fifteen years. Mrs. McCarthy had been dead for some years. Without the knowledge of defendant, through some arrangement with Thomas, the plaintiff was induced by him to permit her name to be · used in · a deed from McCarthy. It appears from a statement by her attorney during the trial that he had collected $625 from McCarthy for some services performed by plaintiff. No part of this was divided with the defendant in the property division made by the trial court.

Plaintiff testified with considerable equivocation and lack of candor about her business relations with Mr. Thomas. She said:

''In '44 I had worked off and on in Charlie Thomas' office. I had worked for him for one year. That was in '43 to '44. I sued for divorce in '45. I worked for Charlie Thomas all the year of '44. Q. Well, how much did you make there? A. That depended on how long I worked. Q. How much did you earn on your income tax work, for the work you did at Charlie Thomas'? A. There was no money to pay on the income tax work because I had borrowed money from Mr. Thomas to pay bills,

and I had worked that debt off, which amounted to one hundred and fifty dollars. * *. * Q. Do you mean to say you worked for Charlie Thomas a whole year for one hundred and fifty dollars? A. That was part time. * * * January, February and March I worked steady. Q. Let's find out now; you worked for Charlie Thomas and got one hundred and fifty dollars for one year's work, is that what you tell the court? A. Yes. Q. You were down there almost every day during that year weren't you? A. Not working. Q. What were you doing if you weren't working? A. Learning income tax work, studying, and I checked those books. Q. And you didn't get paid for it? You were just spending your time down at his office, going out with him in his car. * * * A. The only time I was in Mr. Thomas' car was when we went down to take care of some business.''

Concerning the McCarthy deed, she testifed:

''I didn't take a deed to it, he did it without me knowing it. * * * I knew nothing about it until it had all been taken care of. Q. You know you were sued to get the title back, and you claim you simply did it for Charlie Thomas, didn't you? A. No. * * * Q. Who did you do it for then; were you in a real estate transaction; [or] were you making some money? A. No. Q. Then why didn't you give him the money or his deed when he asked for it instead of having to sue you for it? A. I was doing it to take care of this elderly gentleman, with nothing in mind for my own self. Q. When he wanted it back, why didn't you give it back? A. Because I felt he was protected for his own good.''

Plaintiff admitted that the defendant objected to her spending all of her time in Thomas² office and going out in his car.

In support of the ground of divorce alleged in her petition, plaintiff relies upon the following matters, to wit: (1) defendant failed to furnish sufficient money for the needs of the family, thereby causing frequent quarrels (2) he was too strict in disciplining the children, which led to quarrels (3) he choked her once, struck her once, kicked her out of bed ''any number of times,'' threatened to sell all the property and put the money in his pocket, threatened to choke Charles to death, and made

a "nervous wreck" of her (4) he had improper association with a woman at Boone and thereafter lost interest in his home and family.

Aside from these particular matters it was her conclusion, generally, that the marriage was a mistake from the start. She testified:

"Throughout, our marital life has never been too happy. We were not a happy family. There were various troubles. I think the most was his dominating the family mostly. He has a very ungovernable temper, very unreasonable. He is not at all sympathetic. He was particularly abusive to the boys in correcting them. * * * There never was a whole lot of affection so far as Mr. Weatherill was concerned, never."

Respecting complaint number one, about money matters, we find scant basis therefor in the record. There is no evidence that defendant did not provide for every reasonable need of the family within the limit of his earning capacity and financial circumstances. There is no claim or evidence that he squandered any of his earnings. We have noted his successful efforts in providing and furnishing a comfortable home. He was paid twice a month. On each payday he gave her $35 to furnish the table. The balance of the money for the payment of all other expenses, including clothing, was deposited in a joint bank checking account upon which each of them could and did draw. His credit was good and she had charge accounts at the stores. He bought his quota of bonds, payable to them jointly. She bought none. She said they were worthless. When he finished payments on the home in February 1945 he was out of debt and had about $1,000 in bonds and cash. There is no dispute about these matters. Plaintiff testified:

"We had large accounts at Beno's [a large general store]. * * * A large account at Joe Smith's was taken out in my name. I bought clothes in there but it was put in his account."

But plaintiff was not satisfied. She testified:

"It was a continual quarrel about money. I have never had enough money and he never seemed to think I needed any.

\* \* \* We had difficulty over money, not over the children. \* \* \* Whenever Charles asked him for money for something, very seldom he ever gave it to him.''

Charles was an industrious boy. He worked every vacation while in high school. He worked for the Penney Company, and earned $320; for Joe Smith, and earned over $500; from the Milwaukee Railroad Company he received $301; and in 1945 he earned $1,207. But he contributed but little to the family exchequer. He testified:

''As a matter of fact I worked most of the time I was in high school. I was always making as much of my own money as I could. I had my own money. And I kept my own money and I spent it as I chose. I did not pay any room and board in the sense of room and board. I had money to spend on other things I wanted, as a rule. \* \* \* I was making my own money \* \* \* from $300 to $500 during the summer only. But I mean to say I didn't save any of it during the school year. \* \* \* Whenever I wanted anything like I was going out on a date, and I didn't have enough money, I knew better than to ask Dad, because I knew he wouldn't give it to me. I would go to mother and tell her what it was for and if she thought it was reasonable enough she would give it to me.''

He did make some contributions to his mother. He testified in March 1946 that he was getting $160 a month, and·''since June [1945] I have made three or four $15 payments, but did not make any other payments.''

The married daughter and son and their children have been in the home. Plaintiff testified:

''Charles is not contributing anything for room and board. He has lived there at home while he was making $160 a month. Fred and his family came there in July and September, and they didn't pay anything either. Alvin is paying a little now and then. I have had nothing now for two weeks, but they help out. \* \* \* I have had a terrible burden there since the first of July to meet all [of] those bills because there wasn't enough coming in.''

Because of housing conditions it was no doubt necessary that the married children and their families be sheltered and cared for in the parental home. But the father was not to blame for it. There is no evidence in the record that he made any complaint. He had been forced out of the home but he contributed $100 a month to the families. He was on good terms with the married children and visited them often. Neither they nor their spouses were witnesses and there is no disclosure in the record that any of them has said a word against him.

The defendant was a frank witness. There was no dodging or equivocating in his testimony. There was no unkind word. He testified:

"We never had any serious trouble. We had arguments off and on the same as anybody else. * * * There was never any trouble between Mrs. Weatherill and myself until about two years ago, maybe some minor arguments about money. * * * There is times in everybody's lives that they don't have no ready cash, but outside of that we never had discussions. She started to work just when I was beginning to get more money, that was the reason I cashed in all those bonds, because I was taking money out of my pay check to buy bonds. * * * She always seemed to think that the pay check ought to go farther than it did. She wanted money—well, I said there is the bank account, whatever there is there, her name was as good as mine on a check. There was no restriction whatever. She has written checks, and she had charge accounts. I do not have any other source of income than my pay check, and when that was through there was no more. So that whether it was enough or not, there was no more.

"First she got her $35 each payday for the grocery bill. That was the grocery bill only. It was not supposed to clothe her also. I paid all utility bills, light, water, and I made all house payments. The clothes were handled from accumulations in the bank. The account which we both drew checks [on]. Any argument over money was because there was not enough money. I spent very little for myself except [for] the necessities of life.

"I never did make any unreasonable requests or demands

of her for personal lust. I might have told her to get out and stay in the arguments we had. That was when we were both arguing. That was in arguments where there were two persons arguing. Mrs. Weatherill and myself. * * * I don't recall any time that Charles needed money but what he got it. I can recall two or three occasions in 1944, and he said, Dad I got a date tonight, can I have a couple of bucks and he always got them.''

There is no serious dispute between the parties with respect to the above matters. The testimony of Charles, in general, supported his mother, but he corroborated his father in a number of matters. Asked by his mother's attorney who was at fault in the home, he testified:

''Well, I personally know that my mother had at no time enough money to do properly what should be done about the house. My father would come in and would lay down a ten or a five dollar bill on the table and turn around and walk away and with that mother was to feed the family and clothe herself and buy the incidentals for the home.''

There is no support in the record for this statement.

All witnesses, including the parties, agree that in the Weatherill home, as in other homes, it required two to carry on a quarrel. Just who started them does not appear. They were not all begun by defendant. Plaintiff held her own and was there at the finish. Charles corroborates his father in saying that the domestic infelicity began not back in 1939 or earlier but much later. He testified:

''From about two years ago in 1944 there were a lot of arguments, that was when they really started. * * * The arguments were not just one-sided affairs, they were arguments pro and con, each defining what they thought was right. It was give and take on both sides. I remember that they started about the time my mother started to work down at Thomas'. Had arguments about the fact she was working down there. I remember my father telling her she did not have to work, and did not like to have her spend her time down there, and she in substance said she wanted to work, was going to work, and did, and generally speaking that was what the arguments

were over during that period. * * * He wanted her to stay home and make a home for the family. He said that. * * * I heard arguments about the McCarthy deal. I can't remember what my father said, except it was a mistake to get into such a deal. He just said he did not like the idea of it and heard him say he was not included in the transaction. He told her she ought to give it back. He said that. * * * I really can't remember that I ever heard my father call my mother any vile names.''

There is no testimony that anyone ever heard him speak thus or profanely to the plaintiff.

We have already touched upon the defendant's relations with the children. There is little more to be said. He was not a harsh taskmaster or a severe disciplinarian. The mother rather took the side of Charles and Nadine. But she testified: ''We had difficulty over money, not over the children.'' Defendant testified:

''There was argument over the discipline of the children, especially when I tried to lay down a formula or a plan for Charles when he started to High School. Well, the objections there was that she would say that I insisted on him remaining at home so many nights a week, that he should cut his activity nights not to exceed three or four nights a week, then is when she took issue—that they were only children once—only young once and why not have a good time while they were young; that she was denied those privileges.''

Some of the complaints are trivial. Note the following:

''Mr. Hess: Now, is there anything else you haven't told us, Charles, with reference to the trouble there at home—any other quarrels that you can tell the court about? A. Whenever my little sister Nadine and I were doing the dishes in the kitchen, and as a brother and sister will do, they get into little scrapes. Father was rather irritable with them, and he came out and made a lot of trouble.''

In answer to a question of Mr. Hess as to whether he had any fatherly relations such as a father and son ordinarily have, Charles replied:

"With the expressions and experiences I had had with other boys' fathers at times, I never got to know [him] like a father and son should. We were never buddies, we never went hunting or fishing.

"Mr. Hess: You never had anything of the kind? * * * Did you notice the effect this was having on your mother's health? * * * Just describe the effect that this conduct was having on your mother? A. She tried to take us places * * * and it was making a nervous wreck of her."

Of this matter defendant testified:

"There has been something said that I don't go hunting or fishing. The fact is with four growing children I couldn't take the time to go fishing."

When Charles and Nadine were not present at the quarrels of their parents plaintiff told them the details later. Sometimes she asked them to participate. The culminating offense of defendant, according to the plaintiff, was his threat to choke Charles to death. She also said he choked her. He testified:

"I never choked her. I would not say that I have ever choked Charles. We had heated arguments, and he notified me to take my glasses off numerous times, and I didn't choke him. * * * It was a matter of discipline, I thought he needed it."

Defendant testified that in March 1945 plaintiff promised him she would not continue in the Thomas office. She did quit on April 1st. But after repeated telephone calls from Thomas she told defendant she was going back to work for him. Defendant told her it was not advisable and plaintiff replied:

"My case does not rest in your hands. It rests in Dr. Earl Bellinger's, and the doctor has told me I had a right to work and I am going to work."

A few days later, on April 24th, without defendant's knowledge, plaintiff went to Mr. Hess' office and the divorce papers were prepared and filed and served on April 26th.

With respect to physical violence to her plaintiff testified that defendant choked her once, struck her once, and kicked

her out of bed several times. She intimated that the latter occurred because of his sexual desires. He testified:

"I never choked her. I never struck her, or kicked her out of bed, or kicked her at any time. The only thing were verbal arguments, which she participated in."

Plaintiff's testimony that defendant choked and kicked her has no corroboration whatsoever. Charles was asked as to his knowledge of his mother's being kicked out of bed. But he testified he knew nothing about it. Nadine also on cross-examination testified that she had no personal knowledge of the matter. She fixed the time of the alleged occurrence as happening during the period when her father was working nights and her mother was at the Thomas office in the daytime when her father slept.

In her petition plaintiff charged that she was compelled to go to the hospital because of defendant's cruelty. But the evidence is that she spent three days in the hospital under the doctor's order because she was suffering from intestinal flu. This was the testimony of plaintiff. She added that a week of "bickering" had preceded the flu attack. No doctor testified to her condition of health nor to any physical ailment. No neighbor or other person testified in her behalf as to any matter. She and Charles and Nadine alone testified for her. They testified that she was run down, always tired, and a nervous wreck.

In response to a question of plaintiff's attorney as to how many times his mother would go upstairs and cry, when his father told her to leave the home and that he was going to sell it, Charles replied that in the three months after she sued for divorce she would do that three or four times a week. Plaintiff's own testimony was that the defendant left the home when the divorce suit was started and never returned. Plaintiff made a rapid recovery after she forced defendant from the home, for she testified "that was what gave me a new lease on life, as I have settled down, I am not nervous."

Much of the questioning and much of the argument on behalf of plaintiff concerned two letters from a woman in Boone, addressed to defendant, which plaintiff found with other letters in his dresser drawer. While the Weatherills were living in

Cedar Rapids the defendant's work required him to be at Boone for some months in 1938. The family remained in Cedar Rapids and he went home for week ends. He was then transferred to Council Bluffs and lived there about a month until the family came from Cedar Rapids in October 1938. One of the letters was dated October 14, 1938. It addressed him as "My Darling Phil." It acknowledged her happiness upon the receipt of his letter and her having read it three times before returning to work after supper. She spoke of her boy Frank being at the football game; of having to get new glasses for him; of going to the movie alone; of mention made in his letter of taking sleeping powders; she warned him of the danger that it might become a habit and of the resulting harm that might ensue to his loved ones and "that dear little girl of yours, I know you want her always to think you are the best person on earth." She spoke of the neighbors and of her daughter and son-in-law having come over to see "Boys Town" and leaving Billie with her. She spoke of a nice afternoon trip to Ames with two old lady friends to see a home one of them had bought. She said:

"No dearest—I haven't met any new friends * * * so you don't need to worry. I love you too much—even though I know we can never be what we would like to each other." She closed with "Well my love, I am going to bed—I don't sleep well either but I need the rest. Good night sweetheart. Your Bright Eyes."

The other letter bears the date of November 3, 1938. It addressed him as "My Dear Pal" and stated that she was tickled to get his letter on returning from work. She spoke of a lonesome Sunday but that Maxine and Harold brought Frank home in the evening and left Billie with her while they went to a show. She expressed some dislike for the new place where she worked, as too many drinking people patronized it, and she was glad her work was in the kitchen. She spoke of some Northwestern employee, rather intoxicated, bringing in a wedding party. Frank had worked all day helping his boss dig potatoes. The letter was rather short and concluded thus:

"Maybe you think I'm not lonesome. It seems like you have

been gone a month. Well my dear I must go to bed and I hope I dream of you. With lots of love from your Bright Eyes.''

Just when plaintiff found these letters does not appear. When she told him about them, she testified that he raved and fussed about it and denied to a certain extent; that she knew the woman who wrote the letters, and told defendant that she had received an anonymous telephone call implicating him; that he denied this, and at his request she wrote the woman, and received a reply from her dated July 1, 1939. It reads in part as follows:

''Dear Mrs. Weatherill, I will try to answer your letter the best I can. I am sure I do not know who could have called you but evidently it was someone trying to stir up trouble. * * *

''As for anyone seeing Gus at my apartment Sunday—that is a falsehood because I have no apartment anymore. I am living in a house with my son, daughter and her husband. And another thing—I was out of town Sunday until late that night. I did not see Gus nor did I know he was in town. As for Gus maintaining an apartment for me—that is another falsehood. Mrs. Weatherill I cannot tell you where all this came from but I do know some busybodies here in this town that might stoop low enough. * * *

''I am very sorry indeed if I have been the cause of any trouble between you and your husband. I would not want to be the cause of breaking up anyone's home. I hope you patch things up and stay together for the sake of your children.

''And I am sorry too that you got the impression that I am a bad woman because I am not. If you could only talk to some of my friends that have known me for years I think you would be convinced. Sincerely [signed].''

The plaintiff did not pursue the matter any further and there is no evidence of any further discussion about it, or of any serious disturbance in the family. He testified that this woman helped prepare the meals at a boardinghouse where he stayed; that she lived elsewhere and he attended shows quite often with her and her adopted daughter and the latter's hus-

band; that after returning to Council .Bluffs he had received the letters and answered them; and that there was no change in his family relations or affections. There is no evidence of any further correspondence or relations of any kind between defendant and the Boone lady or of any similar conduct with any other woman.

Plaintiff made no charge of adultery in her petition but in the printed and the oral argument her attorney contended that the letters are proof of such infidelity. Defendant objected to the admission of the letters because there was no allegation of adultery. This is true, and it is also true that the circumstances relied upon fail to establish the charge of adultery, since they do not lead naturally and fairly to a conclusion of defendant's guilt and do not exclude every rational theory of innocence. See Inskeep v. Inskeep, 5 (Clarke) Iowa 204, 208, 209; Names v. Names, 67 Iowa 383, 386, 25 N. W. 671; Wells v. Wells, 116 Iowa 59, 60, 89 N. W. 98; Anderson v. Anderson, 197 Iowa 383, 387, 388, 197 N. W. 300; Aitchison v. Aitchison, 99 Iowa 93, 95, 96, 103, 68 N. W. 593; Carlisle v. Carlisle, 99 Iowa 247, 256, 68 N. W. 681, 684. In the latter case, the court held that the circumstances were not "inconsistent with the presumption of innocence of adultery that we must hold to exist."

But the letters were admissible as bearing upon the issue of cruelty and inhuman treatment endangering plaintiff's life.

Defendant also objected to the admission of the letters· and the examination involving them, since the misconduct sought to be proven thereby had been condoned. Condonation is an affirmative defense and it was not pleaded. Inman v. Inman, 196 Iowa 845, 849, 195 N. W. 583; Chapman v. Chapman, 181 Iowa 801, 804, 165 N. W. 96; Robbins v. Robbins, 234 Iowa 650, 656, 12 N. W. 2d 564; Nelson v. Nelson, 208 Iowa 713, 716, 225 N. W. 843; Gemricher v. Gemricher, 230 Iowa 1212, 1214, 300 N. W. 517. However, even though not pleaded, the circumstances tending to show condonation may be considered with respect to the frame of mind of the other spouse and the mental attitude toward the misconduct and for its bearing upon the issues of cruelty and danger to life. See Nelson v. Nelson,

supra, 208 Iowa 713, 716, 225 N. W. 843, and Gemricher v. Gemricher, supra, 230 Iowa 1212, 1214, 300 N. W. 517.

Plaintiff testified that after the Boone incident the defendant was "different, his home did not seem to mean a lot to him"; "it was just a place more or less for him to eat and sleep"; "his whole feeling even toward the children was changed"; "he was indifferent"; "so different, just like there was something else in his life that was more important"; "he didn't act like a husband and father should"; "we were just strangers to him." These vague, indefinite statements contain no specific facts and are very largely conclusions. We can consider them only as they bear upon the statutory ground for divorce alleged in the petition. The undisputed conduct of defendant weakens the force of and largely refutes this testimony. Plaintiff alone states that their quarrels began in 1938 and continued thereafter. She is contradicted by both Charles and the defendant, who fix the beginning of real trouble, except for her complaints about money, as contemporaneous with her association with Thomas. There is no corroboration for her testimony as to misconduct prior to that time. She discovered these letters sometime prior to July 1939, for that was the month in which she wrote to the Boone woman. She testified that from then on he lost interest in his home. It was just a place where he ate and slept. He was indifferent to and a stranger to his family. And yet, just a few months later, in November 1939, he acquired a comfortable, well-furnished new home for his wife and four children. He provided well for his family; he sent them to school; no one testified that any member of his family was not properly fed or clothed; and in five years, out of his monthly savings, the home was fully paid for and unencumbered and the family had a little nest egg of savings. Such conduct is not ordinarily indicative of indifference to or neglect of or cruelty to either wife or children.

His attentions to and association with the Boone woman were reproachable, but it is apparent that the misconduct was forgiven, and, if not forgotten, they continued in a sincere endeavor to meet all their marital obligations and make a happy home.

Plaintiff's suit is based on section 598.8(5), Code, 1946

(section 10475(5), Code, 1939), which provides that a divorce may be decreed against the husband "When he is guilty of such inhuman treatment as to endanger the life of the wife."

As the statute clearly states, it is not enough to prove the inhuman treatment. The wife must go further and establish that such treatment endangered her life. Necessarily, this court has always endeavored to carry out the requirements of the statute. The cruelty itself is not a cause. It is but the necessary foundation which must sustain a further finding that the continuance of cohabitation, would, by impairment of health, mental or physical injury, endanger the life of the complaining spouse. It is not necessary that such spouse should wait until the harm has been done. It is enough that the danger is reasonably apprehended. Since the statute is a remedial one, its provisions have uniformly been given such reasonable and liberal construction as will best effect its purpose and protect the interests of the parties and their dependents and the public as a whole. As said in Knight v. Knight, 31 Iowa 451, 455:

"In this class of cases precedents can do little more than inform the understanding and assist the judgment."

But we mention a few decisions particularly applicable to this ground. See Beebe v. Beebe, 10 Iowa 133–139; Freerking v. Freerking, 19 Iowa 34, 36, 37; Vanduzer v. Vanduzer, 70 Iowa 614–617, 31 N. W. 956; Carlisle v. Carlisle, supra, 99 Iowa 247, 249, 250, 68 N. W. 681; Hill v. Hill, 201 Iowa 864–867, 208 N. W. 377; Nelson v. Nelson, supra, 208 Iowa 713–716, 225 N. W. 843; Coffin v. Coffin, 155 Iowa 574–583, 136 N. W. 539; Wallace v. Wallace, 212 Iowa 190, 235 N. W. 728; Hall v. Hall, 162 Iowa 653, 144 N. W. 320; Walker v. Walker, 205 Iowa 395, 217 N. W. 883; Onthank v. Onthank, 230 Iowa 851, 299 N. W. 392; Perry v. Perry, 199 Iowa 685, 202 N. W. 572; Krotz v. Krotz, 209 Iowa 433, 228 N. W. 30; Shors v. Shors, 133 Iowa 22, 110 N. W. 16; Sylvester v. Sylvester, 109 Iowa 401, 80 N. W. 547; Yetley v. Yetley, 196 Iowa 314, 194 N. W. 88; Bosveld v. Bosveld, 232 Iowa 1199, 7 N. W. 2d 782; White v. White, 200 Iowa 779, 205 N. W. 305; Blair v. Blair, 106 Iowa 269, 76 N. W. 700; Naumann v. Naumann, 182 Iowa 420, 165 N. W. 996; Veeder v. Veeder, 189 Iowa 912, 179 N. W. 136; Helmich v. Helmich,

199 Iowa 267, 201 N. W. 798; Carlson v. Carlson, 199 Iowa 953, 202 N. W. 883; Olson v. Olson, 130 Iowa 353, 106 N. W. 758; Wheeler v. Wheeler, 53 Iowa 511, 5 N. W. 689, 36 Am. Rep. 240; Caruthers v. Caruthers, 13 Iowa 266.

There is no corroborated evidence of physical violence in this case. Such mistreatment is not essential to the granting of a decree. Lewis v. Lewis, 235 Iowa 693, 699, 17 N. W. 2d 407, and cases cited; Schnor v. Schnor, 235 Iowa 720, 722, 17 N. W. 2d 375, 157 A. L. R. 628. As said by Justice Ladd, in Pfannebecker v. Pfannebecker, 133 Iowa 425, 436, 110 N. W. 618, 622, 119 Am. St. Rep. 608, 12 Ann. Cas. 543:

"True it is that words and deportment may work injury as deplorable as violence to the person. One of Shakespeare's characters is made to say, 'I will speak daggers to her, but use none.' "

But much of the testimony for plaintiff is unconvincing, and we doubt that it could be said to prove inhuman treatment. Much of it was elicited by leading questions. This always depreciates the probative value of testimony. Plaintiff appears to have been as active and persistent in the quarreling as the defendant. There is little doubt that her constant complaints about money were provocative of much of the dissension. These complaints appear to have had little, if any, justification. Neither party has been without fault. His conduct with the Boone woman was, of course, indiscreet and censurable. And her relations with Thomas were injudicious and ill conceived. For their own welfare and the happiness of the children, and particularly the daughter at home who needs their care, affection, and advice, they should forget past grievances and carry through with their obligations and responsibilities. Much should be borne before the ties of the home and family are broken. A little more patience, increased contentment with the blessings at hand, a willingness to forgive, a restrained tongue, less faultfinding, and a spirit of kindly tolerance for the frailties of each, will bring more abiding peace and content to the Weatherills than the decree of the trial court.

It has been urged upon us that we should give great weight to the finding and conclusion of the district court and

abide by its decision. We have oftentimes done so, notwithstanding we pass upon appeals in equity anew. We always give serious consideration to the views and conclusions of the chancellor below but an examination of the cases cited herein will disclose that this court has many times reversed decrees of divorce on appeal.

After a careful and earnest consideration of all matters presented to us we are firmly convinced that the plaintiff failed to establish the ground for divorce alleged in her petition. And this is particularly true with respect to the issue that her health was impaired and her life thereby endangered by any cruelty or inhuman treatment of the defendant. It is our conclusion that the record does not sustain a finding that her life has been thus endangered or that there is reasonable apprehension that it will be endangered by cohabitation with the defendant.

It is therefore our decision that the decree of the district court, in all its provisions, and all orders made by it in this cause, are set aside and—Reversed.

HALE, WENNERSTRUM, MULRONEY, SMITH, MANTZ, and HAYS, JJ., concur.

GARFIELD, C. J., and OLIVER, J., dissent.